IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

MICHAEL ALAN EWING,

                    Plaintiff,

        v.

CUMBERLAND COUNTY, CUMBERLAND
COUNTY DEPARTMENT OF
CORRECTIONS, LIEUTENANT DALE
SCIORE, SERGEANT CLINT
CIANGAGLINI, SERGEANT BRAD
PIERCE, CORRECTIONAL OFFICER
EDWIN PRATTS, THE ESTATE OF
CORRECTIONAL OFFICER KEVIN
STILL, CORRECTIONAL OFFICER
JOSHUA L. MINGUELA,
CORRECTIONAL OFFICER DREW FORD,
CORRECTIONAL OFFICER JOHN
FAZZOLARI, VINELAND TOWNSHIP,
VINELAND POLICE DEPARTMENT,
POLICE OFFICER JAMES DAY,
POLICE OFFICER STEVEN HOUBARY

                    Defendants.

HONORABLE JEROME B. SIMANDLE

Civil No. 09-5432 (JBS/AMD)

**OPINION**

APPEARANCES:

Martin P. Duffy, Esq.
COZEN AND O'CONNOR
Liberty View Bldg.
457 Haddonfield Rd., Suite 300
Cherry Hill, NJ 08002
     Attorney for Plaintiff Michael Alan Ewing

John C. Eastlack, Jr., Esq.
Daniel Edward Rybeck, Esq.
WEIR & PARTNERS LLP
The Liberty View Building
457 Haddonfield, Suite 310
Cherry Hill, NJ 08002
     Attorneys for Defendants Cumberland County and Cumberland
     County Department of Corrections

Arnold Robinson, Esq.
ROBINSON & ANDUJAR, LLC
2057 Wheaton Ave.
P.O. Box 788
Millville, NJ 08332
    Attorney for Defendants Dale Sciore and Brad Pierce


Shanna McCann, Esq.
CHANCE & MCCANN LLC
P.O. BOX 10
Woodstown, NJ 08098
    Attorney for Defendant Clint Ciangaglini


Linda A. Galella, Esq.
RICHARDSON, GALELLA & AUSTERMUHL
142 Emerson Street, Suite B
Woodbury, NJ 08096
    Attorney for Defendant Edwin Pratts


Michael Louis Testa, Sr., Esq.
Justin Robert White, Esq.
TESTA HECK SCROCCA & TESTA, PA
424 Landis Ave.
P.O. Box 749
Vineland, NJ 08360
    Attorneys for Defendant Estate of Kevin Still


Salvatore J. Siciliano, Esq.
SICILIANO & ASSOCIATES, LLC
16 South Haddon Ave.
P.O. Box 25
Haddonfield, NJ 08033
    Attorney for Defendant Joshua Minguela


Patrick J. Madden, Esq.
Timothy R. Bieg, Esq.
MADDEN & MADDEN, PA
108 Kings Highway East, Suite 200
P.O. Box 210
Haddonfield, NJ 08033-0389
    Attorneys for Defendant Drew Ford


Douglas E. Burry, Esq.
SAPONARO & SITZLER
The Newbold House

2

27 Cedar Street
Mt. Holly, NJ 08060
    Attorney for Defendant John Fazzolari

Judson B. Barrett, Esq.
BARRETT AND PAVLUK, LLC
1200 Eagle Ave., Suite 204
Ocean, NJ 07712
    Attorney for Defendants Vineland Township, Vineland Police
    Department, James Day, and Steven Houbary

## Table of Contents

I. INTRODUCTION ............................................. 4

II. BACKGROUND............................................... 6

  A. Factual Background ...................................... 6

    1. Arrest and Transport to Vineland Police Department and
    Cumberland County Jail .................................... 6

    2. Incident in the Processing room during Plaintiff's first
    trip to the CCDOC (Day, Ciangaglini, Minguela) ............. 8

    3. Incident in the CCDOC control room and strip search room
    during Plaintiff's second visit (Houbary, Pratts, Still,
    Fazzolari, Sciore, Pierce, Minguela, Ford) ............... 11

    4. Use of Force reports ................................. 15

    5. Defendants' Statements ............................... 17

    6. Plaintiff's injuries ................................. 18

    7. Expert reports of Dr. Fred Simon and Dr. Randall McCauley
       21

    8. Training on the use of force at Cumberland County Jail . 22

    9. Internal investigations into excessive force at Cumberland
    County Jail .............................................. 25

    10. Plaintiff's expert report of Dr. Randall McCauley ..... 27

    11. Notice of Claim ...................................... 28

  B. Procedural Background ................................. 30

III. STANDARD OF REVIEW..................................... 32

IV. ANALYSIS ............................................... 33

  A. Claims against Cumberland Correctional Officers ......... 33

    1. Summary judgment is not warranted against Plaintiff's
    § 1983 claim of excessive force .......................... 35

2. Minguela is not entitled to qualified immunity ......... 51

3. Plaintiff's state law claims are not barred by the NJTCA 55

4. Defendants Pratts, Still, Minguela, Ford, Fazzolari, and
Ciangaglini are not entitled to summary judgment on
Plaintiff's assault and battery claim ..................... 62

5. Fazzolari and Pratts are not entitled to summary judgment
on Plaintiff's claim of intentional infliction of emotional
distress ............................................... 64

6. Defendants Pratts, Still, Minguela, Ford, Fazzolari, and
Pierce are not entitled to summary judgment on Plaintiff's
conspiracy claim ....................................... 66

B. Claims against Cumberland County and CCDOC .............. 69

1. Cumberland County is not entitled to summary judgment on
Plaintiff's failure to train and failure to investigate
claims ................................................ 72

2. Plaintiff's common law claims are not precluded by the New
Jersey Tort Claims Act .................................. 81

C. Claims against the Vineland Defendants .................. 83

1. The City of Vineland is entitled to summary judgment on
the § 1983 claim of failure to train and the common law claim
of negligent training ................................... 84

2. The Court will grant summary judgment on Plaintiff's
§ 1983 claim for failure to intervene against Officer Day but
deny summary judgment on the claim against Officer Houbary  88

IV. CONCLUSION.............................................. 93

**SIMANDLE**, Chief Judge:

## I.   INTRODUCTION

This is a case involving excessive force against Plaintiff

Michael Ewing by correctional officers at the Cumberland County

Correctional Facility and police officers of the Vineland Police

Department. After Ewing was arrested in Vineland, New Jersey for

disorderly conduct, he was processed and sent to the Cumberland

4

County Jail, where he was beaten by correctional officers. He suffered multiple traumatic injuries, fractures, and a concussion.

Plaintiff brought suit against the individual officers involved, as well as against Cumberland County, the Cumberland County Jail, Vineland Township ("City of Vineland" or "Vineland"),[1] and the Vineland Police Department, alleging constitutional violations under the Fourteenth Amendment and various state tort claims.

The individual officers and entity Defendants have filed nine motions for summary judgment seeking the dismissal of Plaintiff's § 1983 and state law claims. Because there is a genuine dispute as to whether Cumberland County correctional officers used excessive force against Plaintiff and whether the jail failed to adequately investigate and train officers in the use of force, the Court will deny the Cumberland County Defendants' motions for summary judgment. The Court will, however, grant the Vineland Defendants' motion for summary judgment for all Vineland Defendants except Steven Houbary, and

---

[1] Although Plaintiff named "Vineland Township" as a defendant, Vineland is not a township but is a city in Cumberland County, New Jersey. The parties clarified at oral argument that City of Vineland was the appropriate name for the defendant, and the Court will therefore refer to "Vineland Township" as the "City of Vineland" or "Vineland" throughout this opinion.

will dismiss the City of Vineland (named as Vineland Township), the Vineland Police Department, and Vineland Police Officer James Day from this action.

## II.  BACKGROUND

### A.  Factual Background

Because Plaintiff suffers from memory problems allegedly related to post-traumatic stress and recalls very little of what happened to him, the following facts are taken primarily from other sources in the record.

### 1.  Arrest and transport to Vineland Police Department and Cumberland County Jail

At around 11 p.m. on the evening of June 30, 2008, the Vineland police arrived at a Comfort Inn in Vineland, New Jersey, where Plaintiff was staying, in response to a disorderly persons call. Plaintiff, who was in the area because of a temporary job, had gotten into an argument with the clerk of the hotel, which prompted the clerk to call the police. The clerk refused to let Plaintiff into his room, so Plaintiff went to sleep near some trees behind the hotel. (Pl. Counterstatement of Facts ("Counter SMF") [Docket Item 237] ¶¶ 6-11.)

Police Officer William Bontcue of the Vineland Police Department arrived at the scene and was told that Plaintiff was in the back of the hotel. (Bontcue Dep. 1 [Docket Item 237-4] 93:20-94:13.) According to Bontcue, Plaintiff was lying on the

6

ground but was not acting disorderly. (Id. 94:17-96:2.) Bontcue
called to Plaintiff, who then got up and became "quite
agitated." When Bontcue could not get him to calm down, Bontcue
told Plaintiff that he was under arrest for disorderly conduct.
(Bontcue Dep. 2 [Docket Item 221-8] 48:2- 51:24.) After
Plaintiff pushed Bontcue into a parked van, Bontcue released his
police dog from his car. Bontcue and the dog pushed Plaintiff to
the ground and another police officer who had arrived on the
scene, Officer Michael Fransko, handcuffed Plaintiff. (Bontcue
Dep. 2 52:20-55:12.) Plaintiff was bitten by the police dog and
was pepper sprayed during this encounter. (Minguela Statement of
Material Facts ("Minguela SMF") [Docket Item 221-1] ¶¶ 12-13.)

   Plaintiff was taken to the Vineland Police Department for
processing, where he was pepper sprayed a second time for
spitting at police officers. (Shaw Dep. [Docket Item 221-8]
20:24-21:5; Minguela SMF ¶ 16.) He was then taken to the
hospital to be cleared for dog bites. As he was being secured
into a stretcher by Defendant Officer James Day and Officer Shaw
to go to the hospital, Plaintiff spit in Shaw's face. Shaw then
struck Plaintiff with his hand, and Plaintiff fell off the
stretcher and onto the pavement. Plaintiff sustained a cut over
his left eye. (Shaw Dep. 66:12-25; Minguela SMF ¶¶ 17-18;
Counter SMF ¶¶ 22-23.)

At the hospital, Plaintiff was given two sedatives and cleared for transport to the Cumberland County Correctional Facility ("CCDOC" or "Cumberland County Jail"), where he was to be held. Correctional officers at the Cumberland County Jail were told that Plaintiff was coming and that he was "belligerent" and "irate" and was "trying to fight with officers." (Pratts Dep. [Docket Item 237-8] 157:17-23; Still Dep. [Docket Item 237-10] 214:4-23.)

Day transported Plaintiff to the CCDOC. He stated that it was the practice of the Vineland Police Department to assign the most junior police officer to transport prisoners to the jail. He had transported prisoners to jail before but had received no formal training on the proper procedures for bringing a prisoner to jail. He learned the procedures during his time shadowing another officer following his graduation from the police academy. (Day Dep. 34:18-35:22; 114:10-115:25.)

2. Incident in the processing room during Plaintiff's first trip to the CCDOC (Day, Ciangaglini, Minguela)

Defendant Day brought Plaintiff to a CCDOC processing cell. Defendants Sergeant Clint Ciangaglini and correctional officer Lisa-Brown Carter were in the room. Defendant Joshua Minguela observed from an outside monitor. Day testified that Plaintiff appeared sedated and calm, and was having some difficulty standing because of the sedatives. (Day Dep. [Docket Item 237-6]

8

134:1-135:7; CCDOC Video.) Minguela stated that Plaintiff was
"acting in an irate manner." (Minguela Use of Force report
[Docket Item 237-13].) Nurse Moore, who was called into the
processing cell to examine Plaintiff, did not observe any
injuries to Mr. Ewing other than to his left eye. (See
Deposition of Moore at page 17, lines 15-25, attached as Exhibit
"N").

Nurse Moore refused to accept Plaintiff into the jail
because he did not have medical clearance for an abrasion over
his left eye. (Moore Dep. [Docket Item 237-14] 15:11-21.)
Ciangaglini testified that Plaintiff was still in Day's custody
while Plaintiff was in the processing cell, but Day was under
the belief that Plaintiff was in the custody of CCDOC.
(Ciangaglini Dep. 170:15-24; Day Dep. 154:15-18.)

Plaintiff had to go to the hospital to get a medical
clearance before being admitted as an inmate. Nurse Moore, Day,
and Minguela all testified that Sergeant Ciangaglini then
brought Plaintiff, who was handcuffed, to his feet and
forcefully pushed him into the closed door of the cell. (See Day
Dep. 147:6-21l; Minguela Dep. at page 162:14-24; Moore Dep.
19:24-20:4; see also Deposition of Carter at page 75, lines 5-8
and page 76, lines 6-8, attached as Exhibit "L"). Minguela and
Day believed that Ciangaglini's use of force was "excessive" and

9

"not necessary." (Minguela Dep. [Docket Item 237-15] 163:21-164:6.) Minguela, Day, and Carter did not report the incident to their supervisors.[2]

Defendant Ciangaglini denies pushing Plaintiff into the door. According to Ciangaglini, he was assisting Plaintiff, who was still sedated, with walking to the door of the processing cell. Plaintiff "was face to face with the door until [Ciangaglini] ordered to have the door open." Ciangaglini stated that Plaintiff made no contact with the door. (Ciangaglini Dep. [Docket Item 172:5-174:9.)

Day escorted Plaintiff out of the jail and transported him back to the hospital to get hospital clearance. Day did not recall Plaintiff complaining of being in pain. (Day Dep. 159:9-161:4.)

Plaintiff was examined by Dr. Dominic Diorio at Bridgeton Division of South Jersey Hospital. Dr. Diorio indicated in his

---

[2] Minguela did not report the incident to anyone because he was "the youngest involved in that situation at the time" and felt like "a puppet." He stated that he "did not have the proper training that [he] was supposed to have at the time and [he] kind of just went off of what [his] supervisors told [him]." (Minguela Dep. 165:5-17.) Day admitted that he should have said something to Ciangaglini but did not because he was "brand new," Ciangaglini outranked him, and he believed Plaintiff was in Ciangaglini's custody at the time. (Day Dep. 154:15-18; 150:23-154:6.) Carter did not report the incident because Ciangaglini was her supervisor and she did not want any repercussions. (Carter Dep. [Docket Item 237-12] 61:2-9.)

medical chart that Plaintiff did not report being in any pain
and did not appear to be suffering from any injuries, including
external injuries. Everything appeared to be normal. (Diorio
Dep. [Docket Item 237-20] 28:20-34:18.)

    3.  Incident in the CCDOC control room and strip search
        room during Plaintiff's second visit (Houbary, Pratts,
        Still, Fazzolari, Sciore, Pierce, Minguela, Ford)

        Vineland police officer Steven Houbary relieved Defendant
Day and took Plaintiff back to Cumberland County Jail to be
admitted. Day did not tell Houbary about the earlier incident
with Ciangaglini. (Day Dep. 165:15-167:8.)

        At the time Plaintiff entered the jail with Houbary, the
midnight shift officers were on duty. Defendant Lieutenant Dale
Sciore was the Shift Commander and held the most senior
position. He supervised the other officers as well as the
Sergeants. Defendants Sergeants Ciangaglini and Brad Pierce were
the Shift Supervisors. (Pierce Dep. 22:9-23:2.) Ciangaglini and
Pierce were responsible for the day-to-day operations and for
supervising the officers.

        Houbary brought Plaintiff to the rear control room, where
three correctional officers, Defendants Edwin Pratts, Kevin
Still, and John Fazzolari were waiting to process Plaintiff.

        Pratts was the "Issue Officer" that day and was in charge
of the intake process. As part of the intake process, inmates

11

undergo a pat search and strip search. Pratts received training on pat downs and strip searches during his orientation training but recalled that the training was "real short" and did not go into any depth. He did not receive training on how to be an Issue Officer. (Pratt Dep. 60:3-12; 63:7-15.)

Pratts did not follow the Jail's pat search procedures, which required an inmate to first remove his shoes and socks before the search. He did not know the Jail had a policy on how to conduct a pat search. (Pratts Dep. [Docket Item 237-8] 109:25-111:10.) Pratts told Plaintiff to turn towards the wall, spread his legs, and place both hands on the wall. He ordered Plaintiff to take off his shoes without removing his hands from the wall. (Pratts Dep. 224:19-225:2.) Houbary had never seen another inmate being asked to remove his shoes in this manner. (Houbary Dep. 99:17-21.) Houbary thought that the pat-down procedure was a little different that day because "[u]sually the nurse is called down" to examine the prisoner before a pat-down begins and no nurse was called down for Plaintiff. (Houbary Dep. 87:14-22.) Houbary also noticed that there were more than the normal number of officers in the room. (Houbary Dep. 95:4-24.)

Pratts testified that Plaintiff was "irate" and initially refused to take his shoes off. (Pratts Dep. 225:11-20.) The CCDOC surveillance video shows Plaintiff attempting to comply

12

with Pratts' order by using his foot to take his shoe off.
(CCDOC Surveillance Video, Ex. B of Ciangaglini Br. [Docket Item
226], sent to the Court.) In the process of trying to take off
his shoe, Plaintiff's foot touched Defendant Pratts' leg.
(Houbary Dep. 102:1-20.) Pratts then used physical force to
bring Plaintiff to the ground. (Houbary Dep. 96:16-97:3.)
Houbary "wasn't looking at exactly what was happening," and only
saw Pratts "in his peripheral vision." (Houbary Dep. 94:2-9.).
He didn't clearly see whether Plaintiff had kicked Pratts and
testified, "I was looking at everything peripheral, and I seen
them take him to the ground." Id. 96:13-15; 102:12.)

    Pratts, Still, and Fazzolari then carried Plaintiff to the
strip search room. Defendant Minguela and Defendant Drew Ford
were also ordered to go to the strip search room. In total, five
correctional officers were in the room with Plaintiff. In
addition to those officers, Sergeants Sciore and Pierce went
into the strip search room at the beginning but left after
approximately two minutes.  Sciore left the room and continued
with his duties as Shift Commander. (Sciore Dep. 167:14; 170:3-
7.) Pierce went back into the room later on and observed one
officer with his knee in Plaintiff's back as Plaintiff was face
down on the ground while Still was trying to remove his pants.
(See CCDOC Surveillance Video; Pierce Dep. [Docket Item 230-3]

13

125:23-129:14.)

Houbary did not go into the strip search room but he followed the officers to the strip search room to see what was happening. (Houbary Dep. 109:13-22.). He testified that he observed Plaintiff from outside the room because he had not yet been told that he could leave the jail. Houbary believed that until he was excused to leave the jail, Plaintiff was still partially his responsibility. Pierce escorted Houbary out of the building a few minutes later. (Houbari Dep. 104:4-21.)

Before Houbary left, he saw Plaintiff in the strip search room complying with orders to remove his shoes and socks. (Houbary Dep. 108:2-23; Counter SMF ¶ 94.) Pierce and Sciore, who left the strip search room with Houbary at around the same time, also testified to seeing Plaintiff comply with orders. (Pierce Dep. 112:2-113:25; Sciore Dep. 170:2-7.)

Plaintiff was escorted out of the room approximately six and a half minutes later by Pratts, Minguela, Fazzolari, and Ford. He was taken to the medical unit. There is no surveillance camera in the strip search room.

One inmate whose cell was close to the strip search room, David Pagan, was woken up by correctional officers in the early morning of July 1 and ordered to mop up "a lot of blood" from the area near the strip search room. (Pagan Statement [Docket

14

Item 237-26], at 3-5.)[3] He stated that there was "a whole puddle"
of blood "as big as [a] basketball ring" which he had to mop up.
Pagan found bloodied clothing, including a white shirt that was
"full of blood," which he had to throw away. (Id.) The
surveillance video shows Pagan using a mop to clean up the
floor. The video also shows him leaving the area with a black
garbage bag.

    4. Use of Force reports

    The five Defendants who were in the strip search room
filled out Use of Force reports documenting the force they
allegedly used on Plaintiff. The Use of Force reports state that
Plaintiff was being irate while in the strip search room and
would not comply with a search; that Pratts took down Plaintiff
because Plaintiff "kicked" Pratts; that Minguela gave Plaintiff
a one second burst of pepper spray when he did not comply with
the strip search; and that Plaintiff was taken down a second
time and handcuffed after he turned towards Fazzolari with a
raised, closed fist. (Use of Force reports [Docket Item 237-

---

[3] Plaintiff included a transcript of a taped statement Pagan made
in July 2008 with the Cumberland County Prosecutor's office.
Defendants object that Pagan's testimony is hearsay, as Pagan
was not deposed in connection with this case. Pagan's statement
about what he saw and did is not hearsay, and is largely
confirmed by the video evidence. As Pagan could conceivably be
used as a witness at trial, the Court will accept his testimony
in deciding these summary judgment motions.

13].) Minguela, Still, and Pratts refer to the take down in the
rear control room as a "minimal force" take down. Fazzolari
refers to the take down in the strip search room as a "minimal
force" take down." (Id.) Four of the five reports contained the
same misspelling of the word "irate." (Id.)

Ford testified that at the time, Cumberland County Jail had
a policy requiring officers' Use of Force reports to match. He
also testified that officers had to rewrite reports that did not
match. (Ford Dep. 295:5-10.) He testified that he discussed the
content of the report with the other officers involved "so that
way [the] reports are similar in detail, just to get down time
lines, actions." (Ford Dep. 293:25-294:4.) Victor Bermudez, a
correctional officer at CCDOC, recalled being told by one of the
correctional officers involved in the incident that he was asked
to re-write his report. Bermudez did not recall why the report
had to be changed. (Bermudez Dep. [Docket Item 237-28] 107:5-
16.)

Defendant Pierce reviewed the officers' reports and wrote
his own Use of Force report one hour before he visited Plaintiff
in his cell. Pierce's report indicates that it was done at 5:45
a.m., 15 minutes before Minguela's report was completed and 40
minutes before Ford's report was completed. (Compare Pierce Use
of Force report [Docket Item 237-39] with Minguela and Ford Use

16

of Force reports [Docket Item 237-13]; Pl. Counter SMF ¶ 159.)
Pierce stated in the report that Plaintiff was cleared by Nurse
Moore and had been placed in a transitional holding cell for
observation. At 5:45 a.m., however, Plaintiff had not yet been
cleared.

Pierce's report was consistent with the officers' reports.
He testified that because he was not present during the
incident, he took what his officers told him "at face value."
(Pierce Dep. [Docket Item 237-21] 236:10-14.) Pierce concluded
that the force used on Plaintiff by his officers was
"justified." (Pierce Use of Force Report [Docket Item 237-39].)

        5.  Defendants' statements

The Defendants' accounts of the incident during deposition
were similar to what was in their Use of Force reports.
Defendants testified that Plaintiff was acting belligerent, was
cursing and spitting at the officers, and was making offensive
gestures. They testified that Minguela pepper sprayed Plaintiff
and that a take down was performed in order to get Plaintiff to
comply with the strip search.

There were some inconsistencies with the Use of Force
report. Ford and Pratts testified that all five officers
participated in the take down in the strip search room, while
Still testified that only Pratts, Minguela, and Fazzolari were

involved. (Compare Ford Dep. 250:6-13 and Pratts Dep. 244:20-245:3 with Still Dep. 268:15-24.)

According to Minguela, Plaintiff fell from a bench he was standing on in the room, at which time Fazzolari, Minguela, Still, and Pratts grabbed his legs and arms. (Minguela Dep. 199:17-200:23.) Pierce testified that there were no benches in the strip search room. (Pierce Dep. [Docket Item 237-21] 146:4-147:9.) Ford and Fazzolari did not recall any officers being injured from the encounter in the strip search room. (Ford Dep. 265:20-266:1; Fazzolari Dep. 150:20-151:2.) Ford testified that they did not find any weapons on Plaintiff during the strip search. (Ford Dep. 266:6-8.)

    6.  Plaintiff's injuries

Plaintiff was taken to the medical unit and examined by Nurse Moore. She observed that Plaintiff looked "beaten up" or "roughened up." She heard Plaintiff say to the officers, "Y'all didn't have to beat me like that." (Moore Dep. 26:23-27:5; 28:22-29:10.) Moore observed that Plaintiff had an injury to his right eye that he did not have the first time she saw him. (Moore Dep. 25:19-26:4.) She also heard Defendant Still say to another correctional officer that Still didn't lay a hand on Plaintiff. (Moore Dep. 35:13-14.)

After the medical exam, Plaintiff was taken to a

transitional holding cell. Sergeant Pierce saw Plaintiff in the early morning of July 1, and Plaintiff complained to Pierce of being in pain. (Pierce Dep. [Docket Item 237-21] 226:8-13.) He was given some Motrin. (Id.)

Approximately an hour and a half later, Lisa Brown-Carter, another correctional officer, found Plaintiff lying on the floor of his cell. (Brown-Carter Dep. [Docket Item 237-12] 41:3-5.) She recalled Plaintiff saying, "Help me, help me, I can't breathe," and that he was dizzy. (Id. 42:12-13; 45:1-2.) Brown-Carter noticed that Plaintiff's right eye appeared shut. (Id. 45:8-10.)

Brown-Carter took Plaintiff to the medical unit and helped him undress for the doctor. She noticed bruising on Plaintiff's lower back, "scrapes on his rib area," and a mark the shape of a footprint on Plaintiff's back. (Brown-Carter Dep. 46:24-49:2.)

Later that morning, Victor Bermudez, a correctional officer, was sent to retrieve Plaintiff from a holding cell for a matter related to Plaintiff's case. He described Plaintiff as "battered up." Plaintiff was limping and one side of his face was "swollen and black and blue." (Bermudez Dep. [Docket Item 237-28] 134:16-135:3.) Plaintiff had trouble breathing. (Id. 136:11-13.) When Bermudez asked Plaintiff what had happened, Plaintiff said that he couldn't remember. (Id. 140:3-4.)

19

Bermudez also recalled Plaintiff turning a "gray-green color," which Bermudez had seen before in three inmates who had died. (Id. 135:8-23.) Bermudez "knew" that individuals who turned that color were "not getting enough blood," and advised Lieutenant Susan Luciano, the Shift Commander that day, to take Plaintiff to the hospital. (Id. 138:4-139:6.)

Plaintiff was taken to South Jersey Regional Medical Center in an ambulance. The EMT report noted that Plaintiff "had severe bruising on his abdomen area and severe bruising on his back and a perfect foot print on his lower left shoulder." It also stated that Plaintiff's "leg and buttocks was bruised from a[sic] dog bites that did not puncture the skin." (EMT Report [Docket Item 237-32].) Plaintiff told the EMT that he "was beat up by the police department and sprayed with maced[sic] and then the dog was let loose on him." (Id.)

Because of his injuries, Plaintiff was transported by helicopter to Cooper Hospital Trauma Center for medical treatment. He was in hemodynamic shock and was admitted to the intensive care unit on a ventilator. (See Cooper Hospital Discharge Summary [Docket Item 237-35].) Cooper Hospital records indicate that Plaintiff had suffered numerous injuries, including a lacerated kidney and renal artery which caused internal bleeding, fracture of the bones around his right eye,

20

multiple fractured ribs, a fractured jaw bone, and a concussion. (See Cooper Hospital Summary Sheet [Docket Item 237-37].) He was at the hospital for ten days. (See Cooper Hospital Discharge Summary.)

Nurse Moore testified that when Pratts returned to Cumberland County Jail for his shift the next day, he told her that she "knew what to say" if people began to ask questions. (Moore Dep. 47:7-48:8.)

    7.  Expert reports of Dr. Fred Simon and Dr. Randall
        McCauley

Plaintiff submitted expert testimony from Dr. Fred Simon, a board certified General Surgeon who practices Acute Care Surgery. Simon opined that Plaintiff's injuries, "[o]ther than the dog bites and abrasion over his left eye, . . . were caused by brute aggressive blunt trauma in the Cumberland County Jail." Simon stated that the injuries "require[] significant force," and "could not have been caused by the 'take down' seen in the [surveillance] video and the second 'take down' described in the Use of Force Reports that occurred in the strip search room." (Simon Letter [Docket Item 237-31]).

Plaintiff's expert Dr. Randall McCauley, a Professor Emeritus of Criminology at Indiana University of Pennsylvania, opined that with a multiple officer take down, the harm suffered by Plaintiff would be minimized.

21

8.  <u>Training on the use of force at Cumberland County Jail</u>

The New Jersey Attorney General's Use of Force Policy ("AG Policy") requires every law enforcement agency to hold trainings twice a year on the appropriate use of force and deadly force.[4] Cumberland County Jail has adopted the AG Policy. (Sciore Dep. 29:19 – 31:14; Saunders Dep. [Docket Item 237-41] 88:25-89:11.)

There is conflicting evidence on CCDOC's compliance with the AG policy at the time of Plaintiff's assault. Minguela, Ford, and Fazzolari, did not recall receiving use of force training other than during their initial two-week training at the Jail and training at the police academy, which they were required to complete within one year of hire. (<u>See</u> Pratts Dep. 75:13-16-81:5-9; Minguela Dep. 32:12-33:12; 46:13-22; Ford Dep. 57:3-9; Fazzolari Dep. 83:12-85:12.)

Glenn Saunders, the Warden at Cumberland County Jail at the time of the incident, stated that in 2008, correctional officers

---

[4] The "Training Requirements" of the AG Policy states:
> Every law enforcement agency is required to conduct and document semi-annual training for all officers on the lawful and appropriate use of force and deadly force. This training must be designed to reflect current standards established by statutory and case law, as well as statewide, county and individual agency policy. It should include but not necessarily be limited to the use of force in general, the use of physical and mechanical force, the use of deadly force, and the limitations that govern the use of force and deadly force.

(Attorney General's Use of Force Policy [Docket Item 237-40], at 7.)

did not receive any use of force training other than during the initial academy and jail trainings. (Saunders Dep. 84:10-14.)

Sciore testified that CCDOC provided use of force training to its officers twice a year as part of the bi-annual firearms re-certification. However, Pratts and Ciangaglini did not remember ever reviewing use of force policies during fire-arms re-certification, and Minguela testified that he was "sure" that they did not review use of force training during the semi-annual firearms recertification. (Compare Sciore Dep. 29:8-30:22 with Minguela Dep. 52:17-53:25; Ford Dep. 60:17-61:6; Pratts Dep. 80:22-81:4; Ciangaglini Dep. 117:11-14.) Ford did not recall whether this was ever done. (Ford Dep. 60:14-61:6.)[5]

The CCDOC keeps a training log showing officers' attendance at training sessions. (Training Log [Docket Item 237-42]; Counter SMF ¶ 173.)[6] The training log indicates that of the five correctional officers who in the strip search room, only Still had received training which included training on use of force within six months of the July 30, 2008 incident because he was a new hire.[7] Sergeants Pierce and Ciangaglini and Lieutenant Sciore

---

[5] Still, Pratts, Fazzolari, and Minguela did not attend firearms training at any time before the incident. (Counter SMF ¶ 184.)
[6] The Training log shows some entries for "Training" which does not specify whether use of force training was included.
[7] Ford's last training on use of force occurred nearly five years before the incident. Pratts had attended a training session two years before the incident. Two officers, Fazzolari and Minguela,

had last attended training which included use of force training approximately nine years before the incident. (Id.) Captain Michael Palau, the head of the Internal Affairs and training unit, testified that the training log did not reflect all of the training the officers at the jail may have received. (Palau Dep. [Docket Item 237-25] 123:17-124:2.)

Pursuant to New Jersey law, Cumberland County Jail also required new hires to attend academy training, which included a training on use of force, within one year of their hire.[8] (CCDOC Policy 5.2 [Docket Item 237-22].) Correctional officers who were not academy trained within one year were not allowed to work at the jail without a waiver from the State. Glenn Saunders, the warden at CCDOC at the time of the incident, stated that the academy training "did not always happen" within the one-year period. Four of the five officers who were in the strip search room –Still, Pratts, Minguela, and Fazzolari – had not been academy-trained at the time of the incident. (Pratt Dep. 67:25-68:10; Minguela Dep. 31:11-19.)[9] Pratts, Minguela, and Fazzolari

_____

had been trained approximately one year before the incident. Still attended a training three months before the incident. (Training Log [Docket Item 237-42]; Counter SMF ¶ 173.)
[8] Correctional officers who have not yet completed police academy training are on probationary status and are considered "recruits." (Minguela Dep. 31:23-32:6.)
[9] Waivers from this requirement could be granted at the request of the CCDOC.

24

received waivers from the one-year requirement.

Minguela and Pratts did not believe they were properly trained at the time of the incident. Pratts stated that he did not feel ready to be a corrections officer until after he finally received his academy training, because it was there that correctional officers were shown "everything, exactly how to understand the policies and procedures." (Pratts Dep. 62:10-21.) Likewise, Minguela testified, "[T]o this day, I don't think anybody in this facility should work intake or issue without being academy trained." (Minguela Dep. 165:23-25.)

9.   Internal investigations into excessive force at
     Cumberland County Jail

The CCODC policy required correctional officers to fill out statements on the use of force each time they used physical, mechanical, or deadly force on an inmate. These statements would be reviewed by a shift supervisor, who would determine whether the force was justified or not justified. The shift supervisor's report and determination would then be reviewed by the captain, the Professional Standards Officer ("PSO") in the internal affairs unit, and the Warden. (Saunders Dep. 78:4-81:12; Palau Dep. [Docket Item 237-25] 199:24-200:7.) In Plaintiff's case, the captain did not sign off on Pierce's Use of Force report, suggesting that he either did not forward it on or did not receive it. (Saunders Dep. 81:15-82:17.) The report also does

not indicate that it was reviewed by either the PSO or the
Warden.

Lieutenant Susan Luciano, a retired correctional officer
who worked for Cumberland County Jail for 25 years, testified
that she would write up incident reports whenever she received
credible information from inmates that they had been beaten up
by guards, yet she never saw any investigation into the reports
she submitted nor did she ever see any officers being
disciplined for the incidents. (Luciano Dep. [Docket Item 237-
27] 37:11–39:21.)Luciano stated that her supervisor, Captain
Lamcken called her a "troublemaker" and would tell her, in sum
and substance, "[y]ou're a pain in the ass, you know, just mind
your own business, you know, do you have to write everything
up." She testified, "I'm a firm believer in if there's something
wrong then you need to report it. An a lot of people say, well,
if you don't see it, you know, it will go away, or if you don't
write it down, it will go away, and I couldn't do that."
(Luciano Dep. 54:24–56:3.)

Lieutenant Walter Wroniuk, who was assigned to the Internal
Affairs and training unit at the time of the incident, testified
that the CCDOC did not have a formal mechanism in place to
monitor and track complaints against individual correctional
officers. Moreover, past complaints made against a particular

26

officer did not factor into any new investigation into excessive
force by that officer. Wroniuk Dep. 91:12-21; 136:6-12.)

     10. <u>Plaintiff's expert report of Dr. Randall McCauley</u>

     Plaintiff submitted expert testimony from Dr. Randall
McCauley, a Professor Emeritus of Criminology at Indiana
University of Pennsylvania. McCauley reviewed Use of Force
reports at Cumberland County Jail that were filed between 2003
and 2013. He concluded that the Use of Force reports were not
reviewed according to the jail policy by all necessary parties.
From 2003 to 2004, the reports were reviewed by the shift
supervisor, the captain, the PSO, and the Warden. The Warden did
not review any reports after 2004. The PSO signed off on less
than half of the reports in 2007 and reviewed no reports that
were filed after 2008. He opined that there was a "steady
decline in review and accountability below the Jail's standards"
beginning in 2005, and that the Jail "violated its own policies
and procedures as well as good and accepted corrections
practice" by not having the designated personnel review each Use
of Force report. (<u>Id.</u> ¶¶ 29-30.)

     McCauley noted an increase in the amount of force being
used by correctional officers between the years 2003 and 2008.
Out of 364 reported incidents of force at Cumberland County
Jail, investigations were opened by the Internal Affairs unit

only six times. (Id. ¶¶ 34-35.) The use of force was deemed
"unjustified" three times. (McCauley Aff. [Docket Item 237-17].)
McCauley opined that based on his review of the excessive force
allegations contained in the Use of Force reports, the jail
should have opened investigations into "far more" incidents.
(Id. ¶ 36.) He opined that the jail's practice of conducting
deficient or no internal affairs investigations "reflects a
complete indifference to the safety, security, and well-being of
its personnel and inmates." (McCauley Letter Report [Docket Item
237-17], at 56.) Defendants dispute the conclusions reached in
McCauley's Affidavit.

McCauley also reviewed the Vineland Police Department's
training practices. He concluded that the Vineland Police
Department failed to provide adequate training to police
officers on the appropriate procedures to be followed for
transporting prisoners to the jail, and that the failure was
contrary to accepted police practice. (Id. at 56.) McCauley
reviewed the particular police actions in this case and
concluded that had Officer Day been properly trained in
procedures involving transfer of prisoner custody, he would have
known that Plaintiff was still in his custody when Ciangaglini
pushed Plaintiff into the door. (Id. at 42.)

11. Notice of claim

28

Plaintiff was represented by Brian Chacker, Esq. from July 2008 to July 2010. On July 25, 2008, Chacker sent a letter to the Vineland Police Department notifying them that he had been retained to represent Plaintiff in a claim against the Vineland Police Department arising from the June 30, 2008 incident. (Ex. C to Chacker Aff. [Docket Item 237-48].) The Vineland Police Department subsequently requested that Chacker complete a Notice of Claim form. (Id. Ex. E.) The letter stated, "Upon receipt of completed Notice of Claim form, your claim will be processed." (Id.) Chacker returned the form by letter dated December 3, 2008. In the section in which he was supposed to list the names of City employees involved, Chacker wrote, Vineland Police Department, Cumberland County Dept. of Corrections. The specific identifies of the [assailant] is unknown at[sic] this time." In the negligence claim section, Chacker wrote, "Excessive use of force by the Police Officers and Correctional Officers." (Id. Ex. F.) Vineland did not follow up with Chacker regarding his claim. (Chacker Aff. ¶ 16.)

On July 9, 2008, Chacker faxed a letter to Warden Saunders at Cumberland County Jail. The letter stated that Chacker's office had been retained to represent Plaintiff "in connection with severe and permanent injuries that he sustained as a result of an incident with either Vineland Police Officers or Officers

from the Cumberland County Department of Corrections on June 30, 2008." The letter asked Cumberland County Jail not to deny him access to his client at Cooper Hospital. The letter also requested copies of surveillance video from the prison, "as this incident took place either in the Vineland Police Station or the Cumberland County Department of Corrections." (Ex. A to Chacker Aff.) Chacker later spoke to Sergeant Wroniuk in the Internal Affairs unit at Cumberland about visiting Plaintiff at the hospital, and faxed a confirmatory letter the same day. (Chacker Aff. ¶¶ 8-9; Ex. B to Chacker Aff.)

## B.   **Procedural Background**

Plaintiff filed his Complaint in October 2009, asserting claims against Cumberland County, Cumberland County Department of Corrections, Pratts, Still, Ford, Minguela, Fazzolari, Pierce, Sciore, Ciangaglini, and two other correctional officers who have since been dismissed from the suit.[10] Plaintiff also named as defendants the City of Vineland, the Vineland Police Department, and the two Vineland police officers, Day and Houbary. Plaintiff's claims revolve around his treatment inside the Cumberland County Jail; he does not bring any claims related to his arrest by Vineland police officers outside the Comfort

---

[10] Correctional Officers Marvin Church and Rena Miller were voluntarily dismissed from the suit on August 14, 2014. [Docket Item 222.]

Inn.

In September 2013, Plaintiff filed an Amended Complaint alleging state law claims as well as constitutional claims under 42 U.S.C. § 1983. [Docket Item 116.][11] Against the remaining eight individual correctional officers at Cumberland County Jail, Plaintiff asserts claims under § 1983 for excessive force and malicious prosecution, as well as state law claims of assault and battery, intentional infliction of emotional distress, conspiracy, and invasion of privacy. With respect to Vineland police officers Day and Houbary, Plaintiff asserts a claim of failure to intervene under § 1983. Finally, Plaintiff asserts § 1983 and state law claims against the entity Defendants, Cumberland County, Cumberland County Department of Corrections, the City of Vineland, and the Vineland Police Department, for failure to properly train individual officers, and failure to investigate excessive force claims.

---

[11] In July 2009, Fazzolari, Ford, Minguela, Still and Pratts were indicted by a grand jury for aggravated assault, official misconduct, falsifying records, obstructing justice, and conspiracy in connection with the June 30, 2008 incident. The Court stayed this case in 2010 pending resolution of the Cumberland County officers' criminal cases. In April 2013, a verdict in favor of defendant Kevin Stills was entered in the case. Thereafter, the Cumberland County Prosecutor dismissed the criminal charges against the remaining indicted defendants, namely Pratts, Minguela, Ford, and Fazzolari. (Pl. Mot. to Amend [Docket Item 112] ¶¶ 9-10.) This Court lifted the stay in June 2013.

The various Defendants have filed nine motions for summary judgment to dismiss all claims. The Cumberland Defendants filed a single motion to address the claims against Cumberland County and CCDOC. The individual Cumberland correctional officers have each filed briefs to address the claims against the officers. The Vineland Police Department, the City of Vineland, and the two Vineland police officers, Day and Houbary, have filed a single brief to dismiss all claims against them. The Cumberland Defendants oppose summary judgment for the Vineland Defendants.

III. **STANDARD OF REVIEW**

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In reviewing a motion for summary judgment, the court is required to examine the evidence in light most favorable to the non-moving party, and resolve all reasonable inferences in that party's favor. Hunt v. Cromartie, 526 U.S. 541, 552 (1999); Wishkin v. Potter, 476 F.3d 180, 184

32

(3d Cir. 2007).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The non-moving party "'need not match, item for item, each piece of evidence proffered by the movant,'" but must simply present more than a "mere scintilla" of evidence on which a jury could reasonably find for the non-moving party. Boyle v. Cnty. of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Anderson v. Liberty Libby, Inc., 477 U.S. 242, 252 (1986)). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," no genuine issue for trial exists and summary judgment shall be granted. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

## IV.  ANALYSIS

### A.  Claims against Cumberland Correctional Officers

Defendants Sciore, Pierce, Pratts, Still, Ford, and Fazzolari have filed individual motions for summary judgment which raise substantially similar arguments. First, they argue that Plaintiff's § 1983 claim must be dismissed because the force used against Plaintiff was not excessive as a matter of

33

law. They also argue that Plaintiff's tort claims are barred by the New Jersey Tort Claims Act's 90-day notice requirement. Defendants also contend that they are entitled to summary judgment even if the NJTCA does not bar Plaintiff's claims because defendants have not engaged in any offensive contact or wrongful act to make out common law claims of assault and battery and conspiracy. In addition, Pratts and Fazzolari argue that they are not liable for a claim of intentional infliction of emotional distress.

Defendant Ciangaglini seeks only partial summary judgment. He seeks to dismiss all claims against him except for the § 1983 excessive force claim and the assault and battery claim. Defendant Minguela seeks to dismiss the common law claims only on the basis of failure to comply with the NJTCA's notice requirement; he does not make any substantive arguments against Plaintiff's common law claims. In addition, Minguela argues that he is entitled to qualified immunity on Plaintiff's § 1983 claim of excessive force.

Plaintiff contends that substantial evidence exists that Defendants used excessive force against Plaintiff in violation of his constitutional rights, and that Defendants are jointly liable under the "concert of action" exception and the "alternative liability" exception. Next, he argues that his

34

state law claims should not be dismissed because he substantially complied with the NJTCA's notice exception and because Defendants never notified Plaintiff of any insufficiency with Plaintiff's notice. He argues that the evidence supports a claim for assault and battery against the five correctional officers in the strip search room; and that all individual Cumberland officers are liable for conspiracy because they attempted to cover up the truth about how Plaintiff had been beaten. He contends that there is also sufficient evidence to support a claim of intentional infliction of emotional distress because Plaintiff developed post-traumatic stress disorder and depression as a result of Defendants' conduct. Finally, Plaintiff argues that Minguela is not entitled to qualified immunity because, given the severity of Plaintiff's injuries, a reasonable officer would have known that the force used violated Plaintiff's clearly established constitutional rights.

> 1. Summary judgment is not warranted against Plaintiff's § 1983 claim of excessive force

42 U.S.C. § 1983 provides a civil remedy against any person who, acting under color of state law, deprives another of rights protected by the U.S. Constitution. The statute provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen

35

> of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution
> and laws, shall be liable to the party injured in an
> action at law . . . .

42 U.S.C. § 1983. Section 1983 does not create substantive
rights; it merely provides a remedy for deprivations of rights
established elsewhere in the Constitution or federal laws.
Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To
establish § 1983 claim, a plaintiff "must demonstrate a
violation of a right secured by the Constitution and laws of the
United States and that the deprivation was committed by a person
acting under color of state law." Id. (quoting Mark v. Borough
of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

> a) The Eighth Amendment standard applies to
>    Plaintiff's excessive force claim

Plaintiff asserts a § 1983 claim of excessive force by
correctional officers, and the Court must first determine the
constitutional right that is implicated. Estate of Smith v.
Marasco, 318 F.3d 497 (3d Cir. 2003). Both parties agree that
plaintiff was a pretrial detainee when he was injured, and the
Court must determine whether the correctional officers' actions
should be analyzed under the Due Process Clause of the Fifth
Amendment or the more stringent Eighth Amendment standard for
cruel and unusual punishment, which applies to inmates who have

been convicted.[12] The distinction is significant: whereas the
Fifth Amendment's Due Process Clause prohibits any form of
punishment, the Eighth Amendment only prohibits punishment that
is cruel and unusual, or force that is imposed "maliciously and
sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7
(1992); Whitley v. Alberts, 475 U.S. 312, 321 (1986).

In particular, the inquiry under the Due Process Clause is
whether Defendants' use of force was rationally related to a
legitimate non-punitive government purpose or when it was
excessive in light of that purpose. Bell v. Wolfish, 441 U.S.
520, 535 (1979); Stevenson v. Carroll, 495 F.3d 62, 68 (3d Cir.
2007) (quoting Rapier v. Harris, 172 F.3d 999, 1005 (7th Cir.
1999)). Under the Eighth Amendment standard, the plaintiff must
demonstrate that the force used was applied maliciously and
sadistically to cause harm and not in a "good-faith effort to
maintain or restore discipline." Hudson v. McMillian, 503 U.S.

---

[12] The Court does not discuss whether the Fourth Amendment should
apply to Plaintiff's claim of excessive force because Plaintiff
was beaten after an arrest but before being admitted to the
general prison population and before a judicial determination of
probable cause. See, e.g., Catherine T. Struve, The Conditions
of Pretrial Detention, 161 U. Pa. L. Rev. 1009 (2013) (arguing
that Graham v. Connor's objective reasonableness test under the
Fourth Amendment is more appropriate for excessive force claims
arising in pre-judicial detention). That argument was not
briefed by either party and the Court will decline to address
it. See Aetna Health Inc. v. Davila, 542 U.S. 200, 212, (2004)
(deeming an argument waived when the "[r]espondent did not
identify this possible argument in their brief in opposition").

1, 7 (1992). The excessive force inquiry must be guided by
several factors: (1) the need for the application of force; (2)
the relationship between the need and the amount of force that
was used; (3) the extent of the injury inflicted on the
plaintiff; (4) the extent of the threat to the safety of staff
and inmates, as reasonably perceived by the officers
responsible; and (5) the efforts made to temper the severity of
a forceful response. Whitley 475 U.S. at 321.

The question of whether the Fifth or Eighth Amendment
standard applies to a pre-trial detainee's claim of excessive
force is not settled.[13] Traditionally, a person who has not been
convicted has "federally protected liberty interests that are
different in kind from those of sentenced inmates." Cobb v.
Aytch, 643 F.2d 946, 962 (3d Cir. 1981) (en banc). He is
entitled to the right to remain at 'liberty,' which is
guaranteed by the Fourteenth Amendment. Id. at 957 ("Unlike
sentenced prisoners, who . . . must look to state law for the
protection of their personal liberties, pretrial detainees have
liberty interests firmly grounded in federal constitutional

---

[13] The law in this area among circuits is split, and the question
of what standard applies in a § 1983 excessive force claim
brought by a pretrial detainee is currently before the Supreme
Court. See Kingsley v. Hendrickson, 744 F.3d 443 (7th Cir.
2014), cert. granted, 2015 WL 213653 (Jan. 15, 2015).

38

law.")

Consistent with this principle, the Supreme Court in Bell
v. Wolfish, 441 U.S. 520, 535 (1979), drew a distinction between
pretrial detainees and inmates who have been sentenced. The
Court reasoned that a pre-trial detainee "may not be punished
prior to an adjudication of guilt in accordance with due process
of law." Id. at 353; see also Hubbard v. Taylor, 399 F.3d 150,
166 (3d Cir. 2005) ("[I]t is clear that plaintiffs here are not
within the ambit of the Eighth Amendment's prohibition against
cruel and unusual punishment. . . . They are not yet at a stage
of the criminal process where they can be punished because they
have not as yet been convicted of anything." (internal
quotations and citations omitted)). By contrast, a sentenced
inmate has already been tried and convicted and stands in a
different category. They "may be punished, although that
punishment may not be 'cruel and unusual' under the Eighth
Amendment." Id. at 535 n.16.

Under this distinction, Plaintiff, who had just been
arrested that day, should be afforded the greater constitutional
protection that is offered by the Due Process Clause. See, e.g.,
Stevenson v. Carroll, 495 F.3d 62, 67-68 (3d Cir. 2007)
(analyzing pretrial detainee's claim under the Due Process
Clause); Sylvester v. City of Newark, 120 Fed. App'x 419, 423

(3d Cir. 2005) (analyzing pretrial detainee's claim under the Fourteenth Amendment because prior to a formal adjudication of guilt, the state "has not acquired 'the power to punish with which the Eighth Amendment is concerned.'" (citing Ingraham v. Wright, 430 U.S. 651, 671-72 n.40 (1977))).

The Court, however, must also be guided by Fuentes v. Wagner, 206 F.3d 335 (3d Cir. 2000), which controls in this Circuit. In Fuentes, the plaintiff, a pretrial detainee, brought a § 1983 claim arguing that placing him in a restraint chair for eight hours after he engaged in a physical fight with correctional officers constituted excessive force. The Third Circuit held that the Eighth Amendment's cruel and unusual punishment standard, not the due process standard, governed the plaintiff's claim. 206 F.3d at 344. The Court made a distinction between cases involving excessive force and those challenging a detainee's conditions of confinement, noting that excessive force claims against prison guards should be subject to the more stringent standard when those claims arise in the context of a prison disturbance. 206 F.3d at 344.

Many courts in this Circuit have followed Fuentes and evaluated a pre-trial detainee's claim of excessive force under the standard of cruel and unusual punishment. See, e.g., Drumgo v. Brown, 525 Fed. App'x 125, 128 (3d Cir. 2013) (applying

40

Eighth Amendment cruel and unusual punishment standards to a
pretrial detainee's excessive force claim against correctional
officers); Everett v. Nort, 547 Fed. App'x 117, 121 (3d Cir.
2013); Johnson v. King, 2013 WL 1903301, at *2 (D.N.J. May 7,
2013); Athill v. Speziale, 2009 WL 1874194, at *8 (D.N.J. June
30, 2009). And the Third Circuit has recently examined Fuentes
and affirmed the distinction between a detainee's excessive
force claim and a claim challenging prison conditions. See
Bistrian v. Levi, 696 F.3d 352, 374-75 (3d Cir. 2012) (holding
that the cruel and unusual punishment standard set forth in
Fuentes did not apply to a pre-trial detainee's claim that his
prolonged administrative segregation was excessive in light of
non-punitive purpose).

Plaintiff argues that Fuentes does not control in the
present case because force was not used in the context of a
prison riot. Plaintiff cites to Jackson v. Phelps, 575 Fed.
App'x 79 (3d Cir. 2014), in which the Court applied the due
process standard to an excessive force claim because the
detainee was "effectively immobilized" in handcuffs, foot
shackles, and a padlock, and posed no safety threat to the
prison guards who beat him up. Id. at 80, 83.

The Court finds Jackson instructive. There is a significant
distinction between using force to quell a prison riot or to

41

stop violence from spreading, and using force when there is no real emergency. Like the detainee in Jackson, Plaintiff was by himself when he was approached by correctional officers. Although he was not handcuffed or shackled, the threat he posed was minimized by the fact that he was unarmed and surrounded by five correctional officers. Plaintiff was also beaten in a closed room; there is little evidence to suggest that he was in danger of escaping or that Defendants were acting to prevent a disturbance from spreading. In Fuentes, the court noted that a more rigorous standard applied in the context of a prison riot, because guards in such cases must react to unpredictable, spontaneous, and rapidly changing events and cannot "be expected to draw such precise distinctions between classes of inmates when those guards are trying to stop a prison disturbance." Fuentes, 206 F.3d at 347. Those concerns are absent in this case. Here, five correctional officers took an unarmed man inside a secure room for a routine strip search, before the man had even been properly admitted to the general prison population, and beat him. Nothing in the record suggests that the force used against Plaintiff arose out of a true emergency situation.[14] Plaintiff was in the booking process when this

---

[14] The Court also notes that in this particular case, where there is evidence of inadequate oversight and accountability over the conduct of correctional officers, there is a higher risk that

violence occurred, preliminary to his being held on a disorderly
persons offense, still accompanied by an officer of the
arresting department. Given these particular facts, the Due
Process Clause appears to be the more appropriate standard by
which to evaluate Plaintiff's claim of excessive force. The Due
Process Clause permits reasonable restraint upon liberty as the
jail admissions process is undertaken; it does not allow
infliction of punishment, excessive or not.

   Regardless of which standard applies, pretrial detainees
"are entitled to at least as much protection as convicted
prisoners, so the protections of the Eighth Amendment would seem
to establish a floor of sorts." Kost v. Kozakiewicz, 1 F.3d 176,
188 n.10 (3d Cir. 1993); cf. Hubbard v. Taylor, 399 F.3d 150,
166-67 (3d Cir. 2005) (noting that in conditions-of-confinement
cases, Eighth Amendment standard establishes a floor below which
treatment of pretrial detainees cannot sink, and does not
preclude the application of a more protective due process
standard). The Court believes that the Fifth Amendment standard
should control in this case, but it will deny summary judgment
on both Fifth and Eighth Amendment grounds because even under

---

officers with little training on use of force will use
inappropriate levels of force to subdue pretrial detainees. The
use of a subjective Eighth Amendment recklessness or malice
standard is not well-suited to curbing jailhouse violence where
officers' subjective sense of reasonableness may be distorted.

the Eighth Amendment's "cruel and unusual standard," a
reasonable jury could find on the evidence presented that
Defendants' use of force was imposed "maliciously and
sadistically to cause harm."

        b) <u>There is a genuine dispute of material fact over</u>
           <u>whether Defendants' use of force was excessive</u>

Plaintiff does not remember what happened to him at the
CCDOC. He argues, however, that given the life-threatening
injuries he suffered after being in the strip search room, a
reasonable jury could conclude that Defendants' use of force in
the room violated his constitutional rights. Plaintiff has
presented more than sufficient evidence to raise a genuine issue
of material fact whether Defendants used excessive force.

Certain facts are not in dispute. Plaintiff was examined at
South Jersey Hospital immediately before going to Cumberland,
and the doctor who examined him noted that he had no visible
injuries aside from the dog bite and cut on his left eye, and
did not appear to have any internal injuries. Plaintiff was then
transported to Cumberland and subject to what was supposed to be
a pat down and strip search. He was unarmed when he submitted to
a strip search in a room with five correctional officers.
Multiple witnesses in the jail testified to Plaintiff's physical
condition after the strip search. Nurse Moore, who examined
Plaintiff immediately after the strip search, observed that

44

Plaintiff looked "beaten up." She heard him say to the officers, "Y'all didn't have to beat me like that." Defendant Pierce, who visited Plaintiff early the next morning, stated that Plaintiff complained of being in pain. Lisa-Brown Carter and Victor Bermudez observed bruises on Plaintiff's body, and recalled that Plaintiff was limping and had trouble breathing.

Plaintiff's injuries are also not disputed. Plaintiff nearly died from the encounter. He had to be airlifted to a specialized trauma center, went into hemodynamic shock along the way, and had to be admitted into the intensive care unit on a ventilator. Healthcare workers observed severe bruising on his body and an imprint of a footprint on his left shoulder. He suffered multiple fractured ribs, a lacerated kidney and renal artery which caused internal bleeding, fractured bones around his right eye, a fractured jaw bone, and a concussion. He was hospitalized for ten days. Based simply on the severity of Plaintiff's injuries and the fact that he was unarmed in the presence of five correctional officers, a reasonable jury could find that Defendants' use of force was excessive. See, e.g., Smith v. Mensinger, 293 F.3d 641, 649 (3d Cir. 2002) ("Punching and kicking someone who is handcuffed behind his back and under the control of at least six prison guards as he is being thrown into cabinets and walls is 'repugnant to the conscience of

45

mankind,' absent the extraordinary circumstances necessary to justify that kind of force." (quoting Hudson v. McMillian, 503 U.S. 1, 10 (1991))); Williams v. Twp. of W. Deptford, 2008 WL 1809134, at *5 (D.N.J. Apr. 22, 2008) ("This Court concludes that it would have been clear to a reasonable police officer that three male officers lifting a woman in the air and throwing her on the ground with force sufficient to break a femur bone is unreasonable where that individual is alone, unarmed, outnumbered by police eight to one.").

Citing Smith, 293 F.3d at 648, Defendants argue that the severity of Plaintiff's injuries is insufficient to impose liability. But Smith is inapposite, for it held only that "de minimis injuries do not necessarily establish de minimis force." 293 F.3d at 648-49. This is not a case where the plaintiff's injuries were de minimis. Smith's holding that a claim of excessive force is possible with even minor injuries counsels against a grant of summary judgment in a case such as this one, where the injuries Plaintiff sustained were life-threatening. In fact, the law is clear that "the extent of injury suffered by [the] inmate" is a factor in establishing an excessive force claim under the Eighth Amendment. Hudson v. McMillian, 503 U.S. 1, 7 (1992); see also Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997) (noting that "the fact that the physical force

46

applied was of such an extent as to lead to injury is indeed a relevant factor to be considered as part of the totality.").

Defendant argues that as a matter of law, the force used was in accordance with protocol and was justified under the circumstances. The Court disagrees, because there is ample evidence in the record contradicting the evidence Defendants claim is undisputed. Defendants first argue that the force was not excessive. For support, they point to correctional officers' testimony that they gave Plaintiff a one-second burst of pepper spray and performed two take downs using "minimal force." A reasonable jury, however, could find that Plaintiff's severe injuries could not have been caused by the force described by Defendants. That view finds support in the evidence. Plaintiff's expert, Dr. McCauley opined that with a multiple officer take down, the harm suffered by Plaintiff would be minimized. Similarly, Dr. Simon testified that Plaintiff's injuries were "caused by brute aggressive blunt trauma" and could not have been caused by the take downs alone.

Defendants also argue that the force was justified under the circumstances. They point to testimony that Plaintiff was biting, kicking, and spitting, but that too is disputed. In contrast to Defendants' testimony, Houbary observed Plaintiff in the strip search room complying with orders to remove his shoes

and socks. (SMF ¶ 93.) A reasonable jury could also give little credence to the officers' testimony because their statements contradict each other. For example, Ford and Pratts testified that all five correctional officers took Plaintiff down in the strip search room, but Still testified that he and Ford were not involved at all, and Minguela testified that Plaintiff merely fell from a bench. The jury could also refuse to credit the Use of Force statements because of Cumberland's policy requiring that officers' statements had to match. Finally, the Court rejects Defendants' bald statement that the Court must accept the officers' testimony as true since Plaintiff cannot recall what happened or name the individual officers who were involved. Defendants should not benefit from Plaintiff's lack of memory when Plaintiff has put forward evidence showing that his memory problems were caused by Defendants' purportedly unlawful conduct.

Because Plaintiff's excessive force claim turns on which of two conflicting stories best captures what happened, summary judgment is not permitted in Defendants' favor. "[T]hat is as it should be. When a plaintiff proffers evidence that the official subdued her with a chokehold even though she complied at all times with his orders, while the official proffers evidence that he used only stern words, a trial must be had." Saucier v. Katz,

48

533 U.S. 194, 216 (2001) (Ginsburg, concurring). In this case, the factual disputes go directly to the amount of force used. Viewing the evidence provided to the Court in the light most favorable to the Plaintiff, as this Court must, a reasonable factfinder could conclude, based on the severity of Plaintiff's injuries, that Defendants applied force unnecessarily and wantonly to inflict pain. The Court will accordingly deny summary judgment.

The Court will also reject Defendants' argument for summary judgment in favor of Officers Still and Ford because there is no evidence that they were active participants in the strip search room. It is undisputed that Still and Ford were in the strip search room the entire time when Plaintiff was beaten. Based on the severity of Plaintiff's injuries, a reasonable jury could infer that Still and Ford assisted in the beating, and the extent of each officer's participation is a factual dispute to be resolved by the fact finder. See Smith, 293 F.3d at 650 (declining to dismiss excessive force claim against certain defendant officers because plaintiff was not sure whether they participated in his assault, because officers were in the vicinity when assault occurred, creating a genuine issue of material fact as to their participation); Perez v. City of Camden, 2014 WL 4681037, at *10 (D.N.J. Sept. 22, 2014)

(declining to dismiss excessive force claim against officers where each officer was present during arrest; admitted to using some force against plaintiff, and plaintiff alleged that at least one officer present used excessive force).

Although Pierce and Sciore were not in the strip search room the whole time, they may also be held responsible under a reasonable view of the facts. As correctional officers, Defendants were responsible for Plaintiff's safety and had a duty to protect him from violence. Farmer v. Brennan, 511 U.S. 825, 834-36 (1994). Pierce and Sciore were present in the strip search room for approximately two minutes. If a jury concluded that even one of the officers in the room used excessive force against Plaintiff, it could also reasonably conclude that Pierce and Sciore knew of and failed to intervene in the assault. Still and Ford, who were in the strip search room for the entire time, could likewise be found liable for failure to intervene. See Smith, 293 F.3d at 650-51 (holding that correctional officer who ignored a realistic opportunity to intervene in another officer's use of excessive force is liable under the Eighth Amendment) (citing Miller v. Smith, 220 F.3d 491, 495 (7th Cir. 2000)); Skrtich v. Thornton, 280 F.3d 1295, 1301 (11th Cir. 2002) (holding that correctional officer present at the scene "and who fails to take reasonable steps to protect the victim of

50

another officer's use of excessive force can be held personally liable for his nonfeasance.").[15]

  2. Minguela is not entitled to qualified immunity

Defendant Minguela alone argues that he is entitled to qualified immunity. The doctrine of qualified immunity "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Under this doctrine, government officials are immune from liability for civil damages as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Kelly v. Borough of Carlisle, 622 F.3d 248, 253 (3d Cir. 2010). Qualified immunity will not, however, act as a shield for "the official who knows or should know he is acting outside the law." Butz v. Economou, 438 U.S. 478, 506-07 (1978). In each case, the government's interests must be balanced against the citizens'

---

[15] Although the Court will permit the § 1983 claim of excessive force against Defendant Ciangaglini to proceed, the Court notes that Plaintiff does not allege that he suffered any harm from being pushed against the door by Ciangaglini. Plaintiff's § 1983 claim for compensatory damages will be limited to $1 exemplary damages unless Plaintiff can prove at trial that he was injured as a result of Ciangaglini's conduct.

interest in vindicating their constitutional rights, as well as the public interest in holding officials accountable "when they exercise power irresponsibly." <u>Pearson</u>, 555 U.S. at 231.

The qualified immunity claim is traditionally analyzed in two steps. First, the court must decide whether the facts alleged, taken light most favorable to the plaintiff, makes out the violation of a constitutional right. <u>Saucier v. Katz</u>, 533 U.S. 194, 121 (2001). Next, the court must examine whether the right at issue was "clearly established" such that a reasonable official would have known that his conduct was unlawful.

Although the Supreme Court held in <u>Pearson</u> that the two-prong <u>Saucier</u> sequence should "no longer be regarded as mandatory," the Court will nonetheless begin by addressing the traditional first prong. <u>See</u> <u>Poe v. Leonard</u>, 282 F.3d 123, 133 (2d Cir. 2002) (officers' intentional violation calls for proper <u>Saucier</u> sequence to provide guidance on what the law requires).

Relying mainly on his own testimony that he used a one-second burst of pepper spray on Plaintiff after giving Plaintiff three verbal warnings to comply with a search, Minguela contends that his conduct did not amount to excessive force. For reasons already discussed above, the Court finds that the facts, in the light most favorable to Plaintiff, are sufficient to make out a constitutional violation. The fact that Plaintiff suffered life-

threatening injuries after facing five correctional officers in an isolated room while unarmed, coupled with the fact that none of the officers were injured, indicates that officers in the room used force beyond what was necessary for a take down, in a manner that was intended to inflict pain. Minguela's version of events is contradicted by other evidence, and the Court, drawing all inferences in light most favorable to Plaintiff, holds that Plaintiff has satisfied the first Saucier prong.

The second prong is also satisfied. It was clearly established at the time Plaintiff was beaten that prisoners were protected from excessive force and wanton beatings that exceed correctional officers' good-faith efforts to maintain discipline and order. See Hudson v. McMillian, 503 U.S. 1, 7 (1992); Whitley v. Albers, 475 U.S. 312, 321 (1986); Klaitz v. New Jersey, 2008 WL 111277, at *7 (D.N.J. Jan. 9, 2008). A reasonable officer at the time would also have known that using enough force against an isolated, unarmed inmate to cause severe, life-threatening injuries was excessive. See Giles v. Kearney, 571 F.3d 318, 327-28 (3d Cir. 2009) ("No reasonable officer could agree that striking and kicking a subdued, nonresisting inmate in the side, with force enough to cause a broken rib and collapsed lung, was reasonable or necessary under established law."); Kounelis v. Sherrer, 529 F. Supp. 2d 503,

53

527 (D.N.J. 2008) (declining to find qualified immunity because a reasonable prison official would have understood that beating a prison inmate without justification violated the Eighth Amendment). The law in this Circuit was also clear that a correctional officer who ignores a realistic opportunity to intervene in another officer's use of force violates a prisoner's constitutional rights. Smith v. Mensinger, 293 F.3d 641, 650-51 (3d Cir. 2002). Under reasonable inferences from the facts favorable to Plaintiff, no reasonable officer could have believed that this use of force and failure to prevent unwarranted injury by others using excessive force was constitutional. Therefore, Minguela is not entitled to qualified immunity.[16]

---

[16] The Court notes that the second prong may also be met because any violation of the Eighth Amendment's prohibition against force "maliciously and sadistically to cause harm" may be considered a clearly established constitutional violation. See Skrtich v. Thornton, 280 F.3d 1295, 1301 (11th Cir. 2002) (holding that "a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution"); Thomas v. Ferguson, 361 F. Supp. 2d 435, 442 n.7 (D.N.J. 2004) (noting that "[m]alicious and sadistic use of force is always in violation of clearly established law."); see also Beers-Capitol v. Whetzel, 256 F.3d 120, 142 n.15 (3d Cir. 2001) (in excessive force case, holding that "to the extent that the plaintiffs have made a showing sufficient to overcome summary judgment on the merits, they have also made a showing sufficient to overcome any claim to qualified immunity.").

54

3.  Plaintiff's state law claims are not barred by the NJTCA

With the exception of Defendant Minguela, all of the individual Cumberland Defendants allege that Plaintiff's state law claims are barred by the New Jersey Tort Claims Act's ("NJTCA") notice requirement. Plaintiff argues that the July 9, 2008 letter sent by his former attorney, Brian Chacker, to the Warden at Cumberland County Jail complied or substantially complied with the requirement.

The NJTCA requires notice of a claim of injury against a public entity to be presented within ninety days of the accrual of the cause of action. A plaintiff is barred from recovering damages from a public entity if "he fail[s] to file his claim with the public entity within ninety (90) days . . . ." N.J.S.A. 59:8-8. Providing such notice within 90 days achieves several goals. It allows the public entity time to review the claim and to promptly investigate the facts and prepare a defense; provides them an opportunity to settle meritorious claims before bringing suit; grants them an opportunity to correct the conditions which gave rise to the claim; and allows them to inform the State in advance as to the expected liability. Velez v. City of Jersey City, 850 A.2d 1238, 1242 (N.J. 2004).

The notice of claim must be presented to the Attorney General or the agency involved in the alleged wrongful act. The

notice must include, among other things, (1) the name and
address of the claimant; (2) the address for sending
communication about the claim (2) the date, place, and other
circumstances of the occurrence which gave rise to the claim;
(3) a general description of the known injury, damage, or loss
incurred "so far as it may be known at the time"; (4) the name
of the public entity, employee, or employees causing the injury;
and (5) the amount claimed as of the date of presentation of the
claim. N.J.S.A. 59:8-4.

In this case, Plaintiff's claim against the Cumberland
defendants accrued on July 1, 2008; under the NJTCA, the filing
was due on September 29, 2008. Plaintiff's previous attorney,
Brian Chacker, faxed a letter to the Saunders, the Warden at
Cumberland County Jail on July 9, 2008, informing Saunders that
he was representing Plaintiff "in connection with severe and
permanent injuries that he sustained as a result of an incident
with either Vineland Police Officers or Officers from the
Cumberland County Department of Corrections on June 30, 2008."
The letter sought approval from the Warden to visit Plaintiff at
the hospital and asked the Warden to preserve surveillance tapes
at the police station and Cumberland County Jail. Mr. Chacker
then communicated by phone with Sergeant Wroniuk about visiting
Plaintiff at the hospital and faxed a letter confirming the

56

visit. Defendants argue that Plaintiff's state law claims must be dismissed because Plaintiff never filed a notice of claim under the NJTCA.

The Court agrees with Plaintiff that the doctrine of substantial compliance should apply in this case. The equitable doctrine of substantial compliance prevents the barring of legitimate claims due to technical defects. Lebron v. Sanchez, 970 A.2d 399, 406 (N.J. Super. Ct. App. Div. 2009); Henderson v. Herman 862 A.2d 1217 (N.J. Super. Ct. App. Div. 2004). The doctrine provides that technical notice defects will not defeat a valid claim as long as the notice that given "substantially satisfies the purposes for which notices of claims are required." Lebron, 970 A.2d at 405-06 (quoting Lameiro v. W. N.Y. Bd. of Educ., 347 A.2d 377, 379 (N.J. Super. Ct. Law Div. 1975); see also Johnson v. Does, 950 F. Supp. 632, 635 (D.N.J. 1997).

Plaintiff's letter provided essentially the same information required under N.J.S.A. § 59:8-4. The letter gave the full name of Plaintiff, and the letterhead showed the name and address of Plaintiff's counsel to which correspondences could be sent. The letter noted that the incident occurred on July 30, and involved correctional officers from Cumberland. Mr. Chacker's request for preservation of surveillance tapes

notified Defendants that the incident occurred at the jail. The letter further stated that Plaintiff suffered "severe and permanent injuries" as a result of the incident. Although the letter did not state specific injuries, the jail was fully aware of the extent of Plaintiff's injuries and treatment since it had guards posted at the hospital and Plaintiff remained in the Warden's custody. Defendants argue that notice was not satisfied because the letter was not mailed via certified mail as required under N.J.S.A. 59:8-10(a). The Court does not find this argument persuasive. N.J.S.A. 59:8-10(b) specifically provides an exception to the certified mail requirement if the claim "is actually received at an office of the State or local public entity within the time prescribed for presentation thereof." It is clear in this case that Defendants received notice of Plaintiff's claim by fax on July 9th, which is well within the 90-day requirement.

Mr. Chacker's letter, along with his subsequent communication with Sergeant Wroniuk about representing Plaintiff with respect to the injuries he sustained and visiting Plaintiff at the hospital, served the purpose of the notice requirement. The communications made Defendants aware of an incident for which they could be liable and gave enough detail for them to begin investigations and to find the correctional officers who

58

were involved. The nature and severity of Plaintiff's injuries also gave Defendants notice of potential damages so that they could inform the State.[17]

The facts in this case are similar to another in which the New Jersey court found substantial compliance. In Dambro v. Union Cnty. Park Comm., 327 A.2d 466 (N.J. Super. Ct. Law Div. 1974), counsel for a plaintiff who injured himself while swimming in a park sent a letter to the borough's police department "advising of his representation of plaintiff in connection with injuries sustained as a result of an accident which occurred two days before at the swimming area." The police responded by sending a police report of the incident and a hospital report indicating that the plaintiff had broken his neck. 327 A.2d at 467. The court held that counsel's letter to the police department complied with the NJTCA's notice requirement even though it did not have the exact name of the public entity which caused the injury, and, like Plaintiff's

---

[17] At oral argument, counsel for Defendant Ciangaglini argued that he never received notice because he personally did not receive the letter sent to Cumberland County. However, the NJTSA does not require Plaintiff to serve the individual employee. The statute explicitly provides that service "upon the public entity shall constitute constructive service upon any employee of that entity." N.J.S.A. 59:8-10(c). Thus, whether or not Ciangaglini ever received Plaintiff's letter notice to Cumberland County is immaterial to whether Plaintiff has satisfied the notice requirement.

letter in this case, lacked any statement of damages. Id. at 471
(commenting that "[a] lack of stated damages will not bar
plaintiff's cause of action if the amount of damages is not
known at the time of the presentation of the claim."). Because
the police department was on notice of the injury and the nature
of the plaintiff's claim, the legislative and remedial goals of
the notice requirement were satisfied. Id. As in Dambro, the
extent and permanency of Plaintiff's injuries were not known at
the time the claim letter was filed.

No factors weigh against providing the relief Plaintiff
seeks. There is no evidence that Defendants were prejudiced by
not having more information. Nothing suggests that Defendants
could have better prepared for Plaintiff's suit or negotiated a
settlement had Plaintiff's counsel provided a statement of
damages or more specific detail about his injuries, of which
they were likely already aware. Nor is there any evidence that
Plaintiff's counsel acted unreasonably or delayed in providing
information. Plaintiff's counsel was as specific in his letter
about identifying the responsible public employees as he could
be under the circumstances and the addressee, the Cumberland
County Jail's Warden, was in a superior position to that of
Plaintiff in determining the identities of the alleged
assailants. Counsel sent Defendants a letter informing them of a

potential suit nine days after the incident. They did not hear from Defendants after the hospital visit and justifiably believed that the letter was sufficient.

Alternatively, the Court also agrees with Plaintiff that equitable estoppel prohibits Defendants from bringing this notice argument as a defense. Plaintiff's complaint was filed in October 2009, yet Defendants waited until August 2014 to file summary judgment motions asserting that Plaintiff failed to comply with the notice requirement. In the interim, they obtained complete discovery, creating the impression that they were waiving the notice requirements. Had Defendants informed Plaintiff after the filing of the complaint that the notice was deficient, Plaintiff would still have had time apply for permission to file a late notice of claim. Hill v. Bd. of Educ. of Middletown Twp., 443 A.2d 225, 228 (N.J. Super. Ct. App. Div. 1982) (holding that equitable estoped prevented defendant from raising noncompliance with notice requirement as an argument, because defendants failed to raise the issue until two and a half years after complaint was filed and progression of case suggested that argument had been waived).

For these reasons, the Court holds that Plaintiff's state law claims are not barred by the NJTCA's notice requirement. Defendants' dismissal motion on this ground is denied.

* * *

Plaintiff asserts state law claims of assault and battery, intentional infliction of emotional distress, and conspiracy. Because Plaintiff concedes that he will not be pursuing either a malicious prosecution or invasion of privacy claim, the Court will dismiss those claims against the individual Defendants. (Pl. Cumberland Officers Br. at 41 n.28.)

   4. Defendants Pratts, Still, Minguela, Ford, Fazzolari, and Ciangaglini are not entitled to summary judgment on Plaintiff's assault and battery claim

Plaintiff argues that Pratts, Still, Minguela, Ford, and Fazzolari are liable to Plaintiff for assault and battery, and that Ciangaglini is also liable for pushing Plaintiff into the door in the processing room.[18]

An individual is liable for the common law tort of assault if (a) he acts intending to cause a harmful or offensive contact with the person, or an imminent apprehension of such a contact, and (b) the person is thereby put in such imminent apprehension. Leang v. Jersey City Bd. of Educ., 969 A.2d 1097, 1117 (N.J. 2009) (citing Wigginton v. Servidio, 734 A.2d 798 (N.J. Super. Ct. App. Div. 1999). The New Jersey Supreme Court has held that "[a]ny non-consensual touching is a battery," and that such a

_____

Plaintiff clarified at oral argument that he does not make a claim of assault and battery against Defendants Pierce and Sciore.

cause of action is established by "proof of an unauthorized invasion of the plaintiff's person, even if harmless." Perna v. Pirozzi, 457 A.2d 431, 439 (N.J. 1983); see also Russo Farms, Inc. v. Vineland Bd. of Educ., 675 A.2d 1077, 1087 (N.J. 1996); Kelly v. Cnty. of Monmouth, 883 A.2d 411, 415 (N.J. Super. Ct. App. Div. 2005).

There is more than sufficient evidence for a reasonable jury to infer that Defendants' contact with Plaintiff in the strip search room amounted to assault and battery. Defendants' argument, that the contact was neither "harmful" nor "offensive," fails in the face of undisputed evidence of Plaintiff's extensive injuries. See Lewis v. Williams, at *6 (D.N.J. Apr. 22, 2008) (denying summary judgment on prisoner's assault and battery claim against correctional officers where prisoner alleged that officers repeatedly struck his head and neck with a closed fist and caused injuries severe enough to require treatment at hospital). Moreover, a reasonable factfinder could find from the uncontroverted facts that the contact was non-consensual, particularly in light of Plaintiff's statement to Defendants, "Y'all didn't have to beat me up that way." As the Court has already explained above, a reasonable jury could find evidence in the record which substantially undermines the veracity of Defendants' testimony about what

63

happened.

Defendant Ciangaglini does not move for summary judgment on Plaintiff's assault and battery claim, and the Court finds that summary judgment is not warranted because there is a material dispute whether Ciangaglini slammed Plaintiff against the door in the processing room, and whether Ciangaglini's use of force was excessive and done for the purpose of inflicting pain. (Ciangaglini Reply Br. [Docket Item 258], at 3 n.1.) Accordingly, the Court will allow Plaintiff to proceed on this claim against all six Defendants.

> 5. <u>Fazzolari and Pratts are not entitled to summary judgment on Plaintiff's claim of intentional infliction of emotional distress</u>

Only Fazzolari and Pratts move to dismiss on the merits of Plaintiff's claim of intentional infliction of emotional distress. The Court will deny Fazzolari and Pratts' motion and permit this claim to proceed.

A claim of intentional infliction of emotional distress requires a plaintiff to establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe. <u>Taylor v. Metzger</u>, 706 A.2d 685, 694 (N.J. 1998); <u>Buckley v. Trenton Sav. Fund Soc'y</u>, 544 A.2d 857, 863 (N.J. 1988).

Plaintiff has proffered evidence from which a reasonable

64

jury could find all elements of this claim. First, as the Court
has explained above, the nature and severity of Plaintiff's
injuries is more than enough for a reasonable jury to conclude
that Defendants' conduct was intentional or at the very least
reckless. Defendants' conduct was also outrageous in character.
The evidence suggesting that five correctional officers, which
included Fazzolari and Pratts, intentionally beat up an unarmed
pretrial detainee causing his near death is without question an
extreme and "utterly intolerable" act in any civilized
community, and goes "beyond all possible bounds of decency."
Buckley, 544 A.2d at 863. Because Plaintiff has come forth with
evidence that he sustained permanent psychological injuries,
including post-traumatic stress syndrome, as a direct result of
the assault, the remaining elements are provable to a reasonable
jury as well. See Subbe-Hirt v. Baccigalupi, 94 F.3d 111, 115
(3d Cir. 1996) (reversing dismissal of intentional infliction of
emotional distress claim where plaintiff suffered from stress,
including post-traumatic stress disorder); Kane v. Chester Cnty.
Dept. of Children, Youth and Families, 10 F. Supp. 3d 671, 693
(E.D. Pa. 2014) (allegation of post-traumatic stress disorder is
sufficient to satisfy requirement of showing severe emotional
distress).

6.  Defendants Pratts, Still, Minguela, Ford, Fazzolari, and Pierce are not entitled to summary judgment on Plaintiff's conspiracy claim

Plaintiff argues that Defendants engaged in a conspiracy to "cover up the truth of what its Correctional Officers had actually done to Defendant." (Pl. Cumberland Officers Br., at 40.)

In New Jersey, a civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means." Banco Popular N. Am. v. Gandi, 876 A.2d 253, 263 (N.J. 2005). The principal element of a conspiracy is an agreement between the parties to inflict a wrong against or injury upon another person, and an overt act that results in damage. Morgan v. Union Cnty. Bd. of Chosen Freeholders, 633 A.2d 985, 998 (N.J. Super. Ct. App. Div. 1993). "The gravamen of a conspiracy action is not the conspiracy itself but the underlying wrong which, absent the conspiracy, would give a right of action." Bd. of Educ. v. Hoek, 183 A.2d 633, 646 (N.J. 1962); see also Middlesex Concrete Prods. v. Carteret Indus. Ass'n, 181 A.2d 774, 779 (N.J. 1962).

Summary judgment is not appropriate on a claim of conspiracy against Defendants Pratts, Still, Minguela, Ford, and Fazzolari. There is evidence that all five correctional officers conspired to cover up their actions by submitting Use of Force

66

reports that significantly downplayed the amount of force they used against Plaintiff in the strip search room. The five reports recounted that Pratts and Fazzolari each took Plaintiff down once, and Minguela gave Plaintiff a one-second burst of pepper spray. Based on the medical treatment Plaintiff received as a result of the incident, and the severity of Plaintiff's physical and psychological injuries, a reasonable juror could conclude that Defendants' statements about the force used on Plaintiff were false. Nurse Moore testified that when Pratts returned to Cumberland County Jail for his shift the next day and learned that Plaintiff had been airlifted to Cooper Hospital for his injuries, he told her that she "knew what to say" if people began to ask questions. A reasonable inference could be made that the reports were falsely written to try to cover up what happened. There was also evidence that Defendants entered into an agreement together. The five statements Defendants submitted were nearly identical in describing certain conduct that is unlikely given the other evidence in the record. Moreover, four of the five reports contained the same misspelling of the word "irate." A juror could reasonably conclude based on this evidence that Defendants acted in concert to falsify the Use of Force reports.

Pierce is also not entitled to summary judgment. There are

67

irregularities in the way Pierce reviewed the officers' Use of
Force reports before deeming the force "justified." First, he
determined that the Defendants' use of force was justified
without attempting to get a statement from Plaintiff. He also
wrote his report before even receiving two of the officers'
statements. In addition, the evidence suggests that he
misrepresented at least one piece of information in the report.
Pierce stated in the report that Plaintiff was cleared by Nurse
Moore and had been placed in a transitional holding cell for
observation, but Plaintiff had not yet been cleared at the time
Pierce completed the report. Finally, Pierce's Use of Force
report reiterated the statements of his officers, even though he
was likely aware of what had happened in the strip search room.
Although these irregularities could suggest that Pierce was
merely sloppy or incompetent or superficial, a reasonable jury
could also conclude that Pierce was aware of and covered up the
fact that his officers used excessive force against Plaintiff.
See Morgan, 633 A.2d at 998-99.

    The Court will dismiss the conspiracy claim against Sciore
and Ciangaglini. Although Plaintiff brings a conspiracy claim
against all Defendants, Plaintiff's brief makes no mention of
either Sciore or Ciangaglini and how they are liable. (Pl.
Cumberland Officers Br. 38-40.) There is no evidence in the

record that Ciangaglini was present or even aware of the
incident in the strip search room, nor is there any evidence
that he participated in, knew, or acquiesced in an agreement to
cover up the beating. Likewise, Plaintiff has pointed to nothing
in the record implicating Sciore in the conspiracy to cover up
the incident. Accordingly, the Court will dismiss the conspiracy
claim against Sciore and Ciangaglini.

    **B.**   **Claims against Cumberland County and CCDOC**

    Plaintiff brings a claim under § 1983 against Cumberland
County and Cumberland County Department of Corrections for
failure to train and failure to investigate claims of excessive
force. The parties agree that Cumberland County Department of
Corrections should be dismissed as a defendant in the § 1983
claim because it is not a proper institutional party-defendant.
See Vuocolo v. Clinton Cnty. Corr. Facility, 2013 WL 572444, at
*4 (M.D. Pa. Jan. 24, 2013) (stating that § 1983 "expressly
limits liability to _persons_ who violate constitutional rights, a
limitation that courts have construed as not reaching county
jails as institutions."); Thomas v. Wilbert, 2011 WL 91001, at
*6 (D.N.J. Jan. 11, 2011) (dismissing county correctional
institution from § 1983 case because it was not a proper
defendant); Grabow v. S. State Corr. Facility, 726 F. Supp. 537,
538-39 (D.N.J. 1989) (New Jersey Department of Corrections and

state prison facilities are not "persons" under § 1983). The Court will therefore enter an order dismissing Cumberland County Jail from the case.

Municipalities and other government entities may be sued under § 1983 for constitutional rights violations, but the entity is not liable under the doctrine of *respondeat superior* for the misconduct of its employees. Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690-692, (1978). Instead, to prevail on a Monell claim, a plaintiff must first establish that the municipality had a policy or custom that deprived him of his constitutional rights. Pelzer v. City of Philadelphia, 656 F. Supp. 2d 517, 531 (E.D. Pa. 2009) (citing Bd. of the County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403-404, (1997)). In other words, the plaintiff must show that the municipality, through one of its policymakers, affirmatively proclaimed the policy, or acquiesced in the widespread custom, that caused the violation. Watson v. Abington Twp., 478 F.3d 144, 155-156 (3d Cir. 2007). A plaintiff may show the existence of a policy when a decision-maker with final authority issues an official proclamation, policy, or edict." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990). Custom may be established by showing that a given course of conduct, "although not specifically endorsed or authorized by law, is so

70

well-settled and permanent as virtually to constitute law." Id.;
see also Watson, 478 F.3d at 155-56. In other words, custom may
be established by proving knowledge of, and acquiescence to, a
practice. Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir.
1989).

Proof of the existence of an unlawful policy or custom is
not enough to maintain a § 1983 action. A plaintiff must
additionally prove that the policy or custom was the proximate
cause of the injuries suffered. Watson, 478 F.3d at 156; Losch
v. Borough of Parkesburg, 736 F.2d 903, 910 (3d Cir. 1984). To
establish causation, the plaintiff must demonstrate a "plausible
nexus" or "affirmative link" between the custom and the specific
deprivation of constitutional rights at issue. Bielevicz, 915
F.2d at 850. And, "[a]s long as the causal link is not too
tenuous, the question whether the municipal policy or custom
proximately caused the constitutional infringement should be
left to the jury." Id. at 851; see also Merman v. City of
Camden, 824 F. Supp. 2d 581, 589 (D.N.J. 2010).

Plaintiff argues that Defendant Cumberland County had a
custom of failing to train the correctional officers in the
appropriate use of force and failing to properly investigate
incidents of officer misconduct, particularly instances of
excessive force. Plaintiff argues that Defendants are liable

71

under 42 U.S.C. § 1983 because the institutional failures at CCCDOC were linked to the beatings Plaintiff received from the correctional officers, in violation of his constitutional right to be free from excessive force. Plaintiff also argues that Defendants are liable under a theory of *respondeat superior* for violations of state common law.

Defendant denies that excessive force was used in violation of the CCDOC's policies. They also argue that even if Plaintiff's constitutional rights were violated, no evidence supports that the harm was caused by Defendant's failure to train and to investigate. Defendant further argues that the New Jersey Tort Claims Act bars Plaintiff's state law claims because Defendant cannot be held liable for the willful misconduct of its employees.

 1. <u>Cumberland County is not entitled to summary judgment on Plaintiff's failure to train and failure to investigate claims</u>

Section 1983 liability may be imposed on a government entity that has a policy or custom of failing to train, manifesting deliberate indifference to the violation of constitutional rights. Where the policy "'concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees

will come into contact.'" Carter v. City of Philadelphia, 181
F.3d 339, 357 (3d Cir. 1999) (quoting City of Canton v. Harris,
489 U.S. 378, 388 (1989)). Additionally, plaintiff must show a
causal link: "the identified deficiency in a city's training
program must be closely related to the ultimate injury." Canton,
489 U.S. at 391; see also Thomas v. Cumberland Cnty., 749 F.3d
217, 222 (3d Cir. 2014).

Deliberate indifference is a "stringent standard of fault,
requiring proof that a municipal actor disregarded a known or
obvious consequence of his action." Bd. of Cnty. Comm'rs of
Bryan Cnty. v. Brown, 520 U.S. 397, 410 (1997). Ordinarily,
deliberate indifference for purposes of failure to train is
demonstrated by a "pattern of similar constitutional violations
by untrained employees." Connick v. Thompson, 131 S.Ct. 1350,
1360 (2011). A pattern of violations puts municipal decision-
makers on notice that a new program is necessary, and "[t]heir
continued adherence to an approach that they know or should know
has failed to prevent tortious conduct by employees" can
establish the deliberate indifference necessary to trigger
municipal liability. Bryan Cnty., 520 U.S. at 407.

Nevertheless, in certain situations, the need for training
is "'so obvious' that failure to do so could properly be
characterized as 'deliberate indifference' to constitutional

73

rights," even without a pattern of constitutional violations. Canton, 489 U.S. at 390 n. 10. A municipality may be liable after a single incident when the violation of constitutional rights is a "highly predictable consequence of failing to equip [] officers with specific tools to handle recurring situations." Bryan Cnty., 520 U.S. at 408-09; Connick v. Thompson, 131 S. Ct. 1350, 1361 (2011) (a single incident may trigger municipal liability where unconstitutional consequences for failure to train are "patently obvious").

Plaintiff has marshalled a number of facts to support his claim that Cumberland County failed to train its correctional officers on the use of force. The evidence shows – and Defendant does not appear to dispute – that the CCDOC failed to meet the state-mandated timelines for completing use of force trainings. This appears to have been a habitual shortcoming, including for most officers who are defendants herein. In addition, the training logs reveal that specific training on the use of force was rarely, if ever, held before the events in this case unfolded. Minguela, Ford, and Fazzolari, did not recall receiving use of force training other than during their initial two-week training at the Jail and training at the police academy. While Sciore stated that officers reviewed the use of force policy during firearms re-certification training twice a

year, no one else could recall that happening.[19] Based on these
facts, a reasonable jury could conclude that in 2008, Cumberland
County provided no periodic training at all on the appropriate
use of force. At the very least, the record shows that there is
a factual dispute over how frequently use of force training was
held.

Plaintiff has also presented evidence that the trainings at
CCDOC were inadequate and untimely. For instance, Pratts, the
Issue Officer the day Plaintiff was brought in, stated that he
never received any training in how to be an Issue Officer and
had "minimal training" in pat downs and strip searches. Several
officers testified that they did not feel like they had received
adequate training in how to be a correctional officer. In
addition, there appeared to be a pattern of providing late
trainings at the police academy. Plaintiff presented evidence
that some officers waited between one and a half to three years
before attending the required academy training. Defendants
frequently requested waivers from the State to delay the
officers' academy training, even though academy training was far
more thorough than the in-house training and was, in two

---

[19] It does not appear that the twice-yearly requirement was
cumbersome for Defendant. Indeed, the training log reveals that
Defendants had no trouble with being punctual in their firearms
re-certification.

officers' opinions, essential to understanding the rules and procedures correctional officers had to follow. Academy training also included important training on the use of force.

The need for use of force training in a jail is obvious, as it is highly predictable that failure to understand its appropriate use would result in injury to inmates and officers alike. A reasonable jury could conclude based on the frequent daily interactions between jailers and inmates that there was a high likelihood constitutional violations might recur if training was not provided. Because it was patently obvious that failure to provide training on the use of force would result in excessive force, the evidence is sufficient for a reasonable juror to conclude that Defendant's failure to train amounted to deliberate indifference. See Thomas, 749 F.3d at 225-26 (finding summary judgment inappropriate on a failure to train claim where potential for conflict in prison was high and lack of training on de-escalation and intervention could establish deliberate indifference); Berg v. Cnty. of Allegheny, 219 F.3d 261 (3d Cir. 2000) (failure to provide protective measures and fail safes against mistake in warrant-issuing procedures precluded summary judgment); Pelzer v. City of Philadelphia, 656 F. Supp. 2d 517, 535-36 (E.D. Pa. 2009) (denying summary judgment on failure to train claim where evidence showed that City provided no

guidelines and offered little training to police officers in how to conduct foot pursuits).

The evidence is also sufficient to sustain a "causal link" between the lack of training and the injuries Plaintiff sustained at the hands of correctional officers. At the time of the incident, four of the five officers in the strip search room (Still, Pratts, Minguela, and Fazzolari) had not yet received training from the academy; and three (Still, Pratts, and Minguela) were supposed to have already received training, but Defendant had delayed it by requesting waivers from the State. According to the training log, none of the officers had attended a specific training on the use of force. Ciagnolini, Pierce, and Sciore, who were the commanding officers at the time, likewise had little training. In fact, the three of them had not had use of force training (or trainings of any kind, for that matter) in the eight years before this incident. It is patently obvious that the officers' ignorance of the rules on how and when to use force against a prisoner might have contributed to their transgression of those rules. Defendant's argument, that there is no causal link between the failure to train and the excessive use of force against Plaintiff, thus cannot be sustained.

For similar reasons, the Court will permit the failure to investigate claim to proceed, since Plaintiff has shown more

than a "mere scintilla" of evidence from which a jury could
conclude that Defendants' procedures were inadequate to protect
from misuse of force. Although Defendant had a policy of
reviewing Use of Force reports to determine whether correctional
officers acted appropriately, the reports were not used to root
out misconduct. Officers who were present were required to write
reports with accounts that matched, and reports were sent back
if they gave conflicting facts. Ford testified that in this
case, all five correctional officers collaborate on the events
inside the strip search room before submitting their identical
reports to Pierce. The reports themselves were frequently not
reviewed by the required personnel after 2004, and the Warden
did not regularly review the reports.

Moreover, the vast majority of the reviews concluded that
the use of force was justified. Few internal investigations into
excessive force ever resulted from the Use of Force reports,
even though an analysis of the reports showed that
investigations were warranted in far more cases. Plaintiff's
expert, Dr. McCauley, noted that out of the 364 reports of force
submitted in 11 years, Defendants investigated only six
incidents and found only three incidents of excessive force.
Lieutenant Wroniuk from the Internal Investigations unit
testified that the jail had no formal procedures in place to

78

track complaints against individual officers, and did not take into consideration past misconduct when faced with a complaint of excessive force against that officer. In short, there were no real procedures in place to detect and prevent problematic behavior by particular officers. Even though the use of force went up steadily in the five years leading up to the incident in this case, the deficiencies in review persisted. A jury could reasonably conclude that the procedures in place were little more than a rubber stamp to justify officer conduct, including conduct that crossed the line into excessive force.

A jury could also conclude that there was a culture of ignoring and failing to investigate misconduct. When Sergeant Ciangaglini pushed Plaintiff against a door using force that appeared to be excessive, neither Minguela nor Brown-Carter reported the incident because Ciangaglini was their superior officer. Lieutenant Pierce testified that when there was a claim of misconduct, he took his officers at their word when they reported what had happened. Even before he visited Plaintiff's holding cell, Pierce had written his Use of Force report and had concluded that the use of force was justified. Although Plaintiff's injuries were severe and should have raised some suspicion, no effort was made to preserve physical evidence for a future investigation.

79

Significantly, as discussed above, Luciano testified that she would frequently report incidents of misconduct, including incidents of excessive force, to her supervisor, but that her reports were consistently ignored. Indeed, her supervisor, Captain Lamcken called her a "troublemaker" and told her to "mind her own business." Luciano's testimony suggests that Defendants knew of past problems with officer misconduct against inmates and, rather than investigate these claims, looked the other way. Dr. McCauley, Plaintiff's expert, testified that Defendant's practice of conducting few investigations and ignoring complaints of excessive force amounted to a "complete indifference to the safety, security, and well-being of its personnel and inmates."

A reasonable jury could conclude based on the evidence above that Defendant's deliberate indifference was the moving force behind Plaintiff's injury. See Bielevicz, 815 F.2d at 851 ("If the City is shown to have tolerated known misconduct by police officers, the issue whether the City's inaction contributed to the individual officers' [unlawful action against the plaintiff] is a question of fact for the jury."); Beck, 89 F.3d at 974-76 (reversing grant of summary judgment on municipal liability claim where evidence showed that investigatory procedures into police misconduct were inadequate; there was no

80

formalized tracking of complaints for individual officers; and there were civilian complaints of officer violence); Merman v. City of Camden, 824 F. Supp. 2d 581, 591 (D.N.J. 2010) (denying summary judgment on claim of inadequate investigations and finding persuasive the fact that there was a significant number of civilian complaints against officers and a comparatively small number of disciplinary sanctions). Summary judgment will be denied.

> 2.  Plaintiff's common law claims are not precluded by the New Jersey Tort Claims Act

The New Jersey Tort Claims Act ("NJTCA") imposes liability for a public entity "for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances. N.J.S.A. 59:2-2(a). Section 59:2-2a of the NJTCA expressly adopts the general concept of vicarious liability for public entities. Hoag v. Brown, 935 A.2d 1218, 1230 (N.J. Super. Ct. App. Div. 2007); Tice v. Cramer, 627 A.2d 1090, 1094 (N.J. 1993). The NJTCA also provides that a public entity is "not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." N.J.S.A. 59:2-10. Thus, there can be no vicarious liability by a public entity for intentional torts committed by its employees. Defendant Cumberland County

argues that Plaintiff's common law claims against the
municipality are barred by the NJTCA because Cumberland County,
as a public entity, cannot be held liable for the willful
misconduct of its employees. (Def. Br. 20-21.)

Defendant Cumberland County is not entitled to summary
judgment on this ground. As Plaintiff correctly points out, the
NJTCA does not immunize Defendant from liability for its
employees' negligent or grossly negligent conduct. See Graham v.
Huevel, 2011 WL 1256607, at *10 (D.N.J. Mar. 28, 2011) (noting
that a "claim for negligent supervision is an independent claim
for direct liability, rather than one for vicarious liability
under a theory of respondeat superior."); Hoag, 935 A.2d at 1230
(same). Plaintiff's theory, that Defendant is liable for its
employees' failure to properly supervise subordinates on the day
Plaintiff was beaten, states a claim of negligent supervision
that is not barred by the NJTCA. Plaintiff additionally states a
claim of negligent failure to train. As Defendant does not
otherwise challenge the sufficiency of Plaintiff's state law
claims, the Court will permit Plaintiff's claims of negligent
supervision and failure to train to proceed.[20]

---

[20] The Court will not consider Defendant's argument that they
failed to receive proper notice of claims, as it was not raised
in Defendant's opening brief. See Bayer AG v. Schein Pharm.,
Inc., 129 F. Supp. 2d 705, 716 (D.N.J. 2001).

C.   **Claims against the Vineland Defendants**

The parties agree that Vineland Police Department should be dismissed as a defendant in the § 1983 claim because it is not a proper institutional party-defendant. Accordingly, an Order will be entered to dismiss the Vineland Police Department.

With respect to the remaining parties, Defendants argue that the § 1983 claim against the City of Vineland ("Vineland") for failure to train must be dismissed because the evidence does not support that Defendant Vineland failed to train its officers, and because there is no causal nexus between Defendant's failure to train and Plaintiff's injury. Defendants additionally argue that Plaintiff's state law claims against Vineland for negligent training must be dismissed because Plaintiff did not file a timely Notice of Claim pursuant to N.J.S.A. 59:8-8.

With respect to the § 1983 claim against Day and Houbary for failure to intervene, Defendants argue that the claim must be dismissed because Day and Houbary did not have a realistic opportunity to intervene to prevent the violation of Plaintiff's rights.[21] Defendant Cumberland County filed an opposition to the

---

[21] The Court sought additional briefing and on the narrow question of whether law enforcement officers have a duty to intervene when the officer has reason to believe excessive force will be used on a victim in the future. Following oral argument, the parties submitted supplemental briefing, and the Court has

Vineland Defendants' motion for summary judgment, arguing that
factual disputes remain as to whether Plaintiff's injuries were
the result of Vineland's conduct.

> 1. <u>The City of Vineland is entitled to summary judgment
>    on the § 1983 claim of failure to train and the common
>    law claim of negligent training</u>

Plaintiff argues that Vineland failed to train its police
officers on the proper procedures for transporting prisoners to
the jail. Day testified that Vineland's custom was to assign the
most junior officers to transport prisoners to the jail, and
that as the junior officer on duty that day, the task was left
to him to bring Plaintiff to Cumberland County Jail. Day also
testified that he received no specific in-house training on
transportation and exchange procedures; he learned how to
transport prisoners only during the months he spent shadowing
other officers following his graduation from the police academy.
The opinion of Plaintiff's expert, Dr. McCauley, was that the
Vineland Police Department's training on transporting and
exchanging prisoners was inadequate.

As discussed above, to prove a § 1983 constitutional
violation for failure to train, the plaintiff must show that the

---

considered only the portions of briefs relevant to this
question. As the Court did not request additional briefing on
any other issue, the parties' submissions outside this topic
were not considered.

defendant's conduct amounted to deliberate indifference, which, absent a pattern of similar constitutional violations by untrained employees, "require[es] proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 410 (1997). In addition, the plaintiff must show an "affirmative link" between the failure to train and the specific constitutional violation that occurred. Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990). Although there is some evidence that Defendant failed to provide adequate training, that dispute is not material because the evidence does not link the lack of training of Vineland officers to the constitutional harm of which Plaintiff complains. Plaintiff has not presented sufficient evidence for a reasonable factfinder to conclude that Defendant Vineland's failure rose to the level of deliberate indifference. Nor has is there enough evidence in the record for a rational jury to find a causal connection between Defendant's failure to train and the injuries Plaintiff suffered.

First, the lack of formal police training in this particular area of the transport of detainees does not create an obvious risk that a prisoner would be beaten by correctional officers at the receiving institution. Not knowing the specific procedures for presenting an inmate to the jail does not

generally pose an obvious danger to the inmate's health and
safety. The process of transport and exchange requires a police
officer to bring a prisoner to the jail and leave him in the
custody of correctional officers, and there is no reason for a
police officer to suspect that correctional officers would
mistreat an inmate. Thus, ignorance of the exact method by which
an exchange of custody takes place at the Cumberland County Jail
does not create a high risk of harm of which Defendant Vineland
should have known.

Second, Plaintiff has not specified what additional
training could have prevented the harm that occurred. See
Woloszyn v. Cnty. of Lawrence, 396 F.3d 314 (3d Cir. 2005)
(failure to identify specific training that could reasonably
have identified the prisoner's suicidal tendencies was fatal).
Plaintiff notes that without training, Day mistakenly believed
that Plaintiff was in Ciangaglini's custody when they were in
the processing room and consequently did not speak up when
excessive force was being used. But Day testified that this was
only one of the reasons why he did not say anything to
Ciangaglini; he also stayed silent because he was "brand new"
and because Ciangaglini, a Lieutenant at the time, outranked
him. More significantly, Day and Houbary both testified that
they knew their obligations to report officer misconduct. Day

stated that he "should have" said something to Ciangaglini and confirmed that his law enforcement training required him to speak up to an officer when he sees that officer using excessive force. (Day Dep. 154:9-157:12.) Similarly, Houbary confirmed that based on his training, it was his responsibility to report the use of excessive force by another officer. (Houbary Dep. 36:1-21.) In other words, it was clear that Day and Houbary knew what they were supposed to do in the present situation, whether or not they received formal training. Thus, even if Day and Houbary had been properly trained on transporting prisoners, there is no reason to believe it would have made a difference in how they reacted to the Cumberland Defendants' conduct.

Because Plaintiff has not shown that Vineland ignored an "obvious risk" of constitutional violations, or that there is a causal link between Vineland's failure to provide formal training on prison transport and the injuries Plaintiff suffered at the jail, the Court will grant summary judgment on Plaintiff's claim against Vineland under 42 U.S.C. § 1983 for failure to train. For similar reasons, the Court will grant summary judgment on Plaintiff's common law claim of negligent training.[22] Both claims will be dismissed.

---

[22] Because Plaintiff has no other common law claims against Vineland, the Court need not decide whether Plaintiff's tort claim is barred by the New Jersey Tort Claim Act.

2.   The Court will grant summary judgment on Plaintiff's
     § 1983 claim for failure to intervene against Officer
     Day but deny summary judgment on the claim against
     Officer Houbary

Plaintiff alleges that Day and Houbary are liable under § 1983 for failure to intervene to prevent the deprivation of Plaintiff's constitutional rights. "It is clear that one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge." Byrd v. Brishke, 466 F.2d 6, 11 (7th Cir. 1972). Under this principal, when a police officer fails to intervene when a constitutional violation such as a beating takes place in his presence, he may be liable under § 1983 for violating the victim's Eighth Amendment rights. Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002) (citing Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986)); Putnam v. Gerloff, 639 F.2d 415, 423 (8th Cir. 1981).

A police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, but liability does not attach in all cases. An officer is liable for failing to intervene only if he saw the beating and there was a "realistic and reasonable opportunity to intervene." Mensinger, 293 F.3d at 650. Generally, the constitutional violation must have occurred in the officer's presence. Clark,

88

783 F.2d at 1007; Brishke, 466 F.2d at 11 (liability for failure
to intervene exists only if the beating occurred in the
officer's presence or was otherwise within his knowledge).

The evidence shows that Defendant Day witnessed Ciangaglini
forcefully push Plaintiff's face into the door of a processing
room during Plaintiff's first trip to Cumberland County Jail.
Minguela, who observed the incident from a monitor, believed
that Ciangaglini used "excessive" force against Plaintiff. Day
also admitted that he thought the use of force was "excessive."
As Ciangaglini does not seek summary judgment on Plaintiff's
§ 1983 claim of excessive force, the Court assumes for purposes
of this motion that Ciangaglini's conduct violated Plaintiff's
rights under the Fifth and Eighth Amendments.

Nonetheless, the Court finds that Day is entitled to
summary judgment, because even assuming a constitutional
violation had occurred, no reasonable jury could find that there
was a reasonable opportunity for Day to intervene before
Plaintiff was mistreated by Ciangaglini. Day did not know that
Ciangaglini would push Plaintiff into the door, and nothing in
the record suggests that Day knew Ciangaglini was about to use
excessive force when he took Plaintiff by the arm to escort him
out of the room. The evidence of record describes an
instantaneous, perhaps impulsive shove by Ciangaglini, to which

89

Day was only a witness. Even if Day had wanted to intervene, the evidence is insufficient as a matter of law to show that he had any opportunity to do so. See O'Neill v. Krzminski, 839 F.2d 9, 11-12 (2d Cir. 1988) (finding no liability where blows were struck too quickly for an officer to intercede); Sullivan v. Warminster Tp., 765 F. Supp. 2d 687, 701-02 (E.D.Pa. 2011) (finding that officers had no realistic or reasonable opportunity to intervene because they were far from where the constitutional deprivation took place and could not reasonably have reached area to prevent harm).[23]

Because the Court finds that the § 1983 claim against Day should be dismissed, the question of damages against Day is moot.

The Court will allow Plaintiff's failure to intervene claim against Houbary to proceed. Houbary was not in the strip search room when Plaintiff was beaten by the correctional officers, nor does the record show that he witnessed correctional officers use inappropriate force against Plaintiff in the strip search room.

Plaintiff argues, however, that Houbary should have stayed

---

[23] Cumberland argues that summary judgment should be denied because there are disputed issues of fact over whether Day failed to intervene during Plaintiff's first encounter near his hotel with officers from Vineland. As Plaintiff's claims against Day relate only to his failure to intervene at the jail and not to the earlier incident, whether Day failed to intervene at the hotel is immaterial to resolving his liability in this case.

at the jail because there were signs that Plaintiff's safety was
at risk. For example, Houbary testified that there were more
than the normal number of officers in the room for Plaintiff's
pat-down and strip search, and the way Pratts performed his pat-
down of Plaintiff in the control room was unusual. Houbary
noticed that the nurse was not called down to examine Plaintiff
before the strip search. He also indicated that Pratt's take
down of Plaintiff may not have been justified, because he did
not see Plaintiff kick Pratts. Although he did not go into the
strip search room, Houbary followed the officers when they took
Plaintiff to the strip search room because he wanted to see what
was happening.

In his supplemental briefing, Plaintiff cites Floyd v. City
of Detroit, 518 F.3d 398 (6th Cir. 2008) and Curley v. Suffern,
268 F.3d 65 (2d Cir. 2001), for the proposition that an officer
may be liable for failing to act to prevent the use of excessive
force where the officer "had reason to know" that excessive
force will be used. See Floyd, 518 F.3d at 406 (police officer
who fails to act to prevent the use of excessive force may be
held liable where officer "had reason to know that excessive
force would be or was being used" and had both the opportunity
and the means to prevent the harm from occurring); Curley, 268
F.3d at 72 ("Failure to interceded results in liability where an

91

officer observes excessive force is being used or has reason to
know that it will be."); see also Hicks v. Norwood, 640 F.3d
839, 843 (9th Cir. 2011) (reciting rule in Floyd); Turner v.
Scott, 119 F.3d 425, 429 (6th Cir. 1997). Plaintiff argues that
the unusual behavior of the correctional officers should have
alerted Houbary to the risk that Plaintiff would be subject to
excessive force, and Houbary's failure to stay in the jail to
protect Plaintiff therefore violated Plaintiff's constitutional
rights.

Plaintiff has raised a material factual dispute whether
Houbary had reason to believe that Plaintiff's safety was in
jeopardy when Houbary left the jail. Even though Houbary
testified that he did not fear for Plaintiff's safety when he
left (Houbary Dep. 135:7-12), a reasonable factfinder could
reject this statement based on other evidence in the record.
Here, immediately after Plaintiff was taken down in a manner
Houbary believed might not have been justified, Houbary
witnessed numerous officers grab Plaintiff and take him into a
strip search room. Particularly when Plaintiff is given the
benefit of all reasonable inferences, a reasonable fact finder
could conclude that Houbary should have known that Plaintiff
would probably be mistreated, and that Houbary had an
opportunity to prevent it by insisting on staying by Plaintiff's

92

side until the strip search was completed. A reasonable jury
could find from the evidence that Houbary's intervention, or
even his mere personal presence, would have prevented the
beating that Plaintiff alleges occurred in the strip search
room. The Court will accordingly deny summary judgment on
Plaintiff's § 1983 claim against Houbary for failure to
intervene.

**IV. CONCLUSION**

For the foregoing reasons, the Court will dismiss
Cumberland County Department of Corrections as a party in the
case and deny the motion for summary judgment by Cumberland
County. Plaintiff's § 1983 claims against Cumberland County for
failure to train and failure to investigate, and common law
claims for negligent training and negligent supervision will be
allowed proceed. The Court will also deny the motions for
summary judgment by Defendants Ciangaglini, Pratts, Still,
Fazzolari, Ford, Minguela, Sciore, and Pierce. However, the
Court will dismiss the conspiracy claim against Sciore and
Ciangaglini.

As to the Vineland defendants, the Court will dismiss the
Vineland Police Department as a party in the case and grant
summary judgment on all counts for Defendants City of Vineland,
and Officer Day. Summary judgment will be denied on Plaintiff's

§ 1983 claim against Houbary for failure to intervene. The

accompanying Order will be entered.


**March 25, 2015**                  **s/ Jerome B. Simandle**
Date                                JEROME B. SIMANDLE
                                    Chief U.S. District Judge